**Mark and Annette KNAUB, et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

No. 318–89C.

United States Claims Court.

Jan. 8, 1991.

Alexander J. Pires, Jr., Washington, D.C., for plaintiffs.

Jeffrey J. Bernstein, Steven A. Hemmat, and Lois P. Murphy, Washington, D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, for defendant. Michael Knipe, U.S. Dept. of Agriculture, of counsel.

## OPINION

MARGOLIS, Judge.

This contract action is before the court on the defendant's motion for summary judgment and the plaintiffs' cross-motion for summary judgment. Plaintiffs who are farmers bring suit challenging determinations by the Secretary of Agriculture ("Sec-

retary") that plaintiffs collectively qualified as only one "person" for payment limitation purposes under price support and production adjustment programs administered by the United States Department of Agriculture ("USDA") during crop years 1987 and 1988. Plaintiffs seek damages for breach of contract based on alternative theories: (1) wrongful determinations by representatives of the Secretary; (2) estoppel; or (3) denial of plaintiffs' procedural due process rights. Defendant, the United States, moves for summary judgment, arguing that the Secretary's determinations should be upheld because they are rationally based on the administrative record and that plaintiffs' estoppel and due process claims are not properly before this court. Plaintiffs also move for summary judgment, arguing that the Secretary's determinations are not rationally based and that the plaintiffs are entitled to relief due to estoppel and denial of their due process rights. After careful review of the administrative record, and after hearing oral argument, this court grants the defendant's motion for summary judgment and denies the plaintiffs' cross-motion for summary judgment.

## BACKGROUND

The Commodity Credit Corporation ("CCC"), through the Agricultural Stabilization and Conservation Service ("ASCS") of the USDA, administers price support and production adjustment programs. *Raines v. United States,* 12 Cl.Ct. 530, 532 n. 1 (1987). Three levels of authority exist under the ASCS. *Id.* On the local and state levels, programs are administered by county and state ASCS committees. 7 C.F.R. § 713.2 (1987 and 1988).[1] On the federal level, the Deputy Administrator, State and County Operations ("DASCO") supervises the state committees. *Id.* Programs were operated in crop years 1987 and 1988 in accordance with the Agricultural Adjustment Act of 1949, as amended, 7 U.S.C. § 1421 *et seq.,* the Food and

---

**1.** Unless otherwise noted, all future citations to the Code of Federal Regulations ("C.F.R.") refer to both the 1987 and 1988 editions.

Agriculture Act of 1977, as amended, 7 U.S.C. § 1309 *et seq.*, the Food Security Act of 1985, as amended, 7 U.S.C. § 1308, *et seq.* and the Commodity Credit Corporation Charter Act, 15 U.S.C. § 714 *et seq.*, as well as the applicable regulations, 7 C.F.R. §§ 713.1–713.116, 795.1–795.24. The purpose of the programs is to obtain a reduction of acreage from production of specified crops in order to adjust the total national acreage of the crops. 7 C.F.R. § 713.49(d).

ASCS program payments are governed by the number of "persons" recognized by ASCS. *Id.* § 795. Payments under the programs at issue in this case are limited to $50,000 for each "person." *Id.* § 713.1. Regulations promulgated by USDA count individuals, partnerships, corporations, and other legal entities that constitute a single unit because of legal or economic relationships as one "person". *Id.* § 795. The regulations define a number of relationships that may cause a group of individuals to qualify as only one "person" for payment limitation purposes. *Id.* § 795.6. For example, prior to 1989, a husband and wife always qualified as one person. *Id.* § 795.11. Additionally, a corporation cannot be a "person" separate from the individual owner if the individual owns more than fifty percent of the stock in the corporation. *Id.* § 795.8(a).

An individual or legal entity engaged in "custom farming" is combined with the individual or entity for whom or which custom farming is performed unless the individual or entity performing custom farming meets certain requirements to be considered as a separate person. *Id.* § 795.16. The custom farming regulation provides:

    (a) Custom farming is the performance of services on a farm such as land preparation, seeding, cultivation, applying pesticides, and harvesting for hire with remuneration on a unit of work basis, except that, for the purpose of applying the provisions of this section, the harvesting of crops and the application of agricultural chemicals by firms regularly engaged in such businesses shall not be regarded as custom farming. A person performing custom farming shall be con-

sidered as being separate from the person for whom the custom farming is performed only if:

    (1) The compensation for the custom farming is paid at a unit of work rate customary in the area and is in no way dependent upon the amount of the crop produced, and (2) the person performing the custom farming (and any other entity in which such person has more than a 20–percent interest) has no interest, directly or indirectly, (i) in the crop on the farm by taking any risk in the production of the crop, sharing in the proceeds, of the crop, granting or guaranteeing the financing of the crop, (ii) in the allotment on the farm, or (iii) in the farm as landowner, landlord, mortgage holder, trustee, lienholder, guarantor, agent, manager, tenant, sharecropper, or any other similar capacity.

    (b) A person having more than a 20–percent interest in any legal entity performing custom farming shall be considered as being separate from the person for whom the custom farming is performed only if:

    (1) The compensation for the custom farming service is paid at a unit of work rate customary in the area and is in no way dependent upon the amount of the crop produced, and (2) the person having such interest in the legal entity performing the custom farming has no interest, directly or indirectly, (i) in the crop on the farm by taking any risk in the production of the crop, sharing in the proceeds of the crop, (ii) in the allotment on the farm, or (iii) in the farm as landowner, landlord, mortgage holder, trustee, lienholder, guarantor, agent, manager, tenant, sharecropper, or in any other similar capacity.

*Id.*

Another regulation, governing financing, provides that in order to be considered a separate "person" for payment limitation purposes, an individual must:

    (a) Have a separate and distinct interest in the land or crop involved,

(b) Exercise separate responsibility for such interest, and

(c) Be responsible for the cost of farming related to such interest from a fund or account separate from that of any other individual or entity.

*Id.* § 795.3(b)(1).

Compliance with the above payment limitation regulations, *id.* § 795, is a prerequisite to full payment, *id.* §§ 713.103(c), 713.-1(b). The payment limitation regulations are used by ASCS to determine whether certain multiple individuals or entities should be combined and treated as one "person" for payment limitation purposes. *Id.* § 795.6. "In cases in which more than one rule would appear to be applicable, the rule which is most restrictive on the number of persons shall apply." *Id.*

## FACTS[2]

Plaintiffs Mark and Annette Knaub ("Mark") are farmers living in Harrisburg, Nebraska. Plaintiffs Melvin and Eldora Knaub ("Melvin") and plaintiffs Mike and Nancy Knaub ("Mike") are farmers living in Gering, Nebraska. Mark and Mike are the adult sons of Melvin and Eldora Knaub.

### Crop Year 1987

The administrative record shows that Melvin, on behalf of Knaub Farms, Inc. ("Knaub Farms") submitted a farm operating plan (ASCS Form 561) for crop year 1987 on December 31, 1986. The operating plan indicated that Melvin and Eldora Knaub together owned all of the shares of the corporation, each owning fifty percent. The plan shows that capital was provided by the Production Credit Association ("PCA"); that Knaub Farms leased all of its land to others; that equipment was provided by Knaub Farms; that Melvin Knaub managed the corporation; and that financing was secured by land and machinery and notes signed by Melvin and Eldora Knaub.

The administrative record also shows that Mark, as an individual, submitted a farm operating plan for crop year 1987 on January 7, 1987. The operating plan indicated that operating capital was to be provided by PCA; that Mark leased 545 acres from Knaub Farms and 1,046 acres from Melvin and Eldora Knaub; that Mark provided the equipment, labor and management; that Mark paid Knaub Farms for truck rental; that financing was provided by PCA and secured by crops and equipment; that Mark and Annette Knaub signed notes and security arrangements as husband and wife; and that Mark Knaub farmed the land in the same manner as in 1986.

Finally, the administrative record shows that Mike as an individual, submitted a farm operating plan for crop year 1987 on January 8, 1987. The operating plan indicated that operating capital was to be provided by PCA; that Mike leased 240 acres from Knaub Farms and 800 acres from Melvin and Eldora Knaub at $100 per acre; that Mike owned 240 acres; that Mike provided equipment, labor and management; that financing was provided by PCA and secured by crops, equipment and land; and that Mike and Nancy Knaub signed notes and security arrangements as husband and wife.

Plaintiffs each signed a contract (Form CCC–477) for the wheat and feed grain program with defendant. The operating plans submitted by plaintiffs were then reviewed by the Scotts Bluff County ASCS Committee and forwarded to the Nebraska State ASCS Committee with the recommendation that plaintiffs be treated collectively as one person for payment limitation purposes.

The state committee then reviewed the operating plans, and on February 12, 1987, notified the county committee that Knaub Farms and Melvin should be treated as one "person," Mike as one "person," and Mark as one "person."[3] The state committee's

---

**2.** The facts in this case are adapted from the administrative record which is the basis of review by this court. *See* discussion, *infra,* concerning the standard of review.

**3.** A corporation cannot be a "person" separate from the individual owner if the individual owns more than fifty percent of the stock in the corporation; 7 C.F.R. § 795.8(a). Prior to 1989, a husband and wife always qualified as one person. *Id.* § 795.11. Assuming compliance

recommendation was conditioned upon satisfactory evidence that the operating notes were secured by the individual respective assets or cosigned by someone not having an interest in Knaub Farms. The state committee also conditioned the recommendation upon satisfactory evidence that rent on equipment leased from Knaub Farms was paid in a timely manner. Subsequently, on March 6, 1987, the county committee determined that the plaintiffs were three "persons" based upon the state committee's recommendation and subject to the conditions imposed by the recommendation. Plaintiffs were advised by letter of the determination and the conditions and were warned that the "persons" determination was subject to further review and could be made more restrictive by the state committee or by DASCO. The letter also stated that "[a]ny unrevealed circumstances could require the application of a more restrictive rule."

Preparing for an annual review, the county committee held a hearing on March 23, 1988, determining that plaintiffs were one person for crop year 1987 purposes. The county committee based its conclusion upon findings that Knaub Farms financed Mark and Mike through delayed reimbursement for the purchase of supplies and delayed equipment rental payments in violation of the financing regulation, 7 C.F.R. § 795.3, and contrary to the operating plans submitted by plaintiffs.

Plaintiffs Mark and Mike appealed to the state ASCS committee. After holding a hearing in which plaintiffs participated, the state committee also found plaintiffs to be one person. The state committee partly based its conclusion upon its finding that Knaub Farms financed Mark's and Mike's farming operations by allowing late payments of inputs (supplies and equipment rental) during crop year 1987. On the basis of checks written by Mark and Mike to Knaub Farms stating that they were payment for *labor*, the state committee also concluded that Knaub Farms, through Mel-

vin, engaged in custom farming while the corporation had an ownership interest in the land that was leased to Mark and Mike by Knaub Farms. On these facts, the custom farming regulation, 7 C.F.R. § 795.16, requires plaintiffs to be counted as one person.

Plaintiff Mark and Mike then appealed to the national Deputy Administrator, State and County Operations (DASCO), pursuant to 7 C.F.R. § 780. On June 15, 1988, an informal hearing was held by a hearing officer designated by the Deputy Administrator at USDA headquarters in Washington, D.C. Melvin, Mark and Mike Knaub, and their attorney, participated in the hearing by telephone, a transcript of which appears in the administrative record. Plaintiffs explained and submitted affidavits to the effect that some of the cancelled checks were annotated "labor" on the advice of a county ASCS official, but that neither Mike nor Mark actually paid Melvin or Knaub Farms for labor. Plaintiffs also contended that payments for equipment and supplies were not delayed so as to amount to financing, but that farmers typically "settled up" after the harvest, when farmers have more time, and expenses can be readily calculated. Plaintiffs further argued that purchases of supplies in bulk by one farmer, who is later repaid by other farmers, is a common practice of farmers in their area.

DASCO, "[b]ased on ... review of the entire case file, including the information presented during and after the telephone hearing, ... denied" plaintiffs' appeal on August 9, 1988. After reviewing the negotiated checks, DASCO determined that labor was paid to Knaub Farms. DASCO also found that payments by Mark and Mike to Knaub Farms for equipment rental and supplies were delayed. While DASCO found that equipment rental leasing arrangements were adequately disclosed to ASCS, it found that delayed payments for supplies were not disclosed and are con-

with other payment limitation regulations, at this time Knaub Farms and Melvin and Eldora, as husband and wife and as owners of more than fifty percent of Knaub Farms, would have

been counted as one person; Mike and Nancy would have been counted as one person; and Mark and Annette would have been counted as one person.

sidered financing of Mark's and Mike's farming operations by Knaub Farms. Specifically, DASCO pointed to delayed payments of Mark for fertilizer and fuel ($14,-000 in October, 1987) and seed beans ($46,-000 in November, 1987) and delayed payments of Mike for fertilizer, labor, seed and rent ($269,475 in October, 1987). Finally, DASCO determined that the bulk purchase of supplies for Melvin, Mark and Mike by Knaub Farms resulted in violation of the regulation, at 7 C.F.R. § 795.3(b)(1), that in order to be considered a separate "person," an individual or legal entity must be responsible for the cost of farming related to such interest from a fund or account separate from that of any other individual or entity.

*Crop Year 1988*

The administrative record shows that Melvin, on behalf of Knaub Farms, submitted a farm operating plan (ASCS Form 561) for crop year 1988 on April 22, 1988. The operating plan indicated that Melvin and Eldora Knaub held ninety percent of the shares of the corporation, each owning forty-five percent, and that Mike owned seven percent and Mark owned three percent. The plan shows that Knaub Farms leased 250 acres to Melvin and Eldora, 673 acres to Mark and Annette, and 320 acres to Mike and Nancy at $100 per acre; that Hancock Insurance Company leased 1,800 acres to Knaub Farms at $50 per acre; that equipment was provided by Knaub Farms and that Melvin provided labor and management. The plan also showed financing by PCA, signed and guaranteed by Melvin and Eldora.

The administrative record also shows that Mark, as an individual, submitted a farm operating plan for crop year 1988 on April 22, 1988. The operating plan indicated that Mike leased 673 acres from Knaub Farms and 1,079 acres from Melvin and Eldora Knaub; that a combine, tractors, planters and trucks were leased from Knaub Farms and that Mark owned other equipment; that labor and management were provided by Mark; and that financing was provided by PCA and secured by crops and savings.

Finally, the administrative record shows that Mike, as an individual, submitted a farm operating plan for crop year 1988 on April 22, 1988. The operating plan shows that Mike owned 220 acres and leased 888 acres from Melvin and Eldora and 343 acres from Knaub Farms; that a planter, combine and tractor were leased from Knaub Farms; that other equipment was owned by Mike; that labor and management were performed by Mike; that financing was provided by PCA and secured by crops, land and money on hand; and that expenses for equipment, rent, fertilizer, chemicals and seed were to be paid by the tenth of the month after billing.

Plaintiffs each signed a contract (Form CCC–477) for the wheat and feed grain program with defendant. On May 5, 1988, the Scotts Bluff County ASCS Committee recommended to the state committee that the plaintiffs be considered as one "person" for 1988 payment limitation purposes. The county committee did so based on the majority interest of Melvin and Eldora in Knaub Farms; the knowledge that labor and the same equipment would be used by Mark and Mike on acreage owned by Melvin and Eldora and Knaub Farms; and that supplies purchased in bulk by Knaub Farms would be used and paid for by Mark and Mike.

On May 23, 1988, the state committee determined that plaintiffs were one "person" for crop year 1988. The county committee concurred. Plaintiffs appealed the county committee determination, but the determination was affirmed. Plaintiffs appealed to the state committee, but it denied the appeal. Plaintiffs then appealed to DASCO.

On June 30, 1989, DASCO denied plaintiffs' appeal and determined that plaintiffs were one "person" for payment limitation purposes. Upon review of the record, DASCO concluded that plaintiffs shared common equipment and labor in violation of the custom farming regulation, 7 C.F.R. § 795.16, and also found that commonly owned equipment secured financing for the various operations. DASCO also found that the bulk purchase of supplies for Mel-

vin, Mark and Mike by Knaub Farms, as in 1987, resulted in violation of the regulation, at 7 C.F.R. § 795.3(b)(1), that in order to be considered a separate "person," an individual or legal entity must be responsible for the cost of farming related to such interest from a fund or account separate from that of any other individual or entity.

## DISCUSSION

The issues presented are whether the determination by DASCO that plaintiffs violated the custom farming regulation, 7 C.F.R. § 795.16, resulting in their combination as one person, lacked a rational basis; whether the determination by DASCO that plaintiffs violated the financing regulation, 7 C.F.R. § 795.3, subjecting them to combination, lacked a rational basis; whether defendant is estopped from asserting that plaintiffs were not three separate persons after plaintiffs relied on the county ASCS committee's decision by performing under the contracts before the adverse determination was made; and whether plaintiffs' rights to procedural due process under the United States Constitution were denied by DASCO's actions.

*Review of DASCO's Determinations*

1. Standard of Review

▌ Plaintiffs' case is similar to *Durant v. United States,* 16 Cl.Ct. 447 (1988); *Willson v. United States,* 14 Cl.Ct. 300 (1988); and *Raines v. United States,* 12 Cl.Ct. 530 (1987). The Claims Court has jurisdiction to review ASCS determinations concerning price support and crop reduction programs to the extent that plaintiffs are making a claim for money damages under the Tucker Act, 28 U.S.C. § 1491(a)(1) (1982). *Willson,* 14 Cl.Ct. at 304; *Raines,* 12 Cl.Ct. at 534. Review of

the legal determinations made by the ASCS is available in this court, but:

> [o]ur role in reviewing administrative determinations under section 1429 is concededly "very limited," but not nonexist[ent]: we need not consider the wisdom of the decisions, but must scrutinize whether the officials acted rationally and within their statutory authority.[4]

*Willson,* 14 Cl.Ct. at 304 (quoting *Raines,* 12 Cl.Ct. at 536 (citations omitted)). *See Durant,* 16 Cl.Ct. at 452–53. Furthermore, section 1385 precludes review of the factual findings made by the agency.[5] *See United States v. Batson,* 782 F.2d 1307, 1311–12 (5th Cir.), *cert. denied,* 477 U.S. 906, 106 S.Ct. 3277, 91 L.Ed.2d 567 (1986); *see also Willson,* 14 Cl.Ct. at 304; *Raines,* 12 Cl.Ct. at 537. *De novo* judicial review is impermissible. *See Durant,* 16 Cl.Ct. at 452. However, legal determinations made by the ASCS, including whether a decision is arbitrary and capricious, are subject to review. *Durant,* 16 Cl.Ct. at 452; *Willson,* 14 Cl.Ct. at 304; and *Raines,* 12 Cl.Ct. at 537.

An agency's interpretation of an administrative regulation is entitled to deference. *Willson,* 14 Cl.Ct. at 307 (citing *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965)). The agency interpretation " 'becomes of controlling weight unless it is plainly erroneous or inconsistent with law.' " *Id.* at 307–08 (citing *Udall,* 380 U.S. at 16–17, 85 S.Ct. at 801 (quoting *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 413–14, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945)); citing *Chevron U.S.A., Inc. v. National Resources Defense Council, Inc.,* 467 U.S. 837, 844–45, 104 S.Ct. 2778, 2782–83, 81 L.Ed.2d 694 (1984) (citing cases)). Plaintiffs do not ar-

---

**4.** Section 1429 provides in pertinent part:
 Determinations made by the Secretary under this Act shall be final and conclusive: *Provided,* That the scope and nature of such determinations shall not be inconsistent with the provisions of the Commodity Credit Corporation Charter Act.
 7 U.S.C. § 1429 (1982) (emphasis in original).

**5.** Section 1385 provides in pertinent part:
 The *facts* constituting the basis for any ... payment under the ... wheat, feed grain ...

programs authorized by the Agricultural Act of 1949 and this Act [Agricultural Adjustment Act of 1938], any loan or price support operation, or the amount thereof, when officially determined in conformity with the applicable regulations prescribed by the Secretary or by the Commodity Credit Corporation, shall be final and conclusive and shall not be reviewable by any other officer or agency of the Government.
 7 U.S.C. § 1385 (1982) (emphasis added).

gue that the ASCS interpretation of the custom farming and finance regulations is contrary to the statute establishing the crop reduction program. Rather, plaintiffs challenge as erroneous and unsupported by the facts the application of the regulations to them. Therefore, the standard for judicial review is "whether the decision was based on a consideration of the relevant facts and whether there has been a clear error of judgment." *Id.* at 308 (citing *Citizens To Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971)). This court's function is to review the facts as determined by ASCS and to ascertain whether a rational basis in the administrative record underlies the decision reached. *E.g., Durant,* 16 Cl.Ct. at 452; *Willson,* 14 Cl.Ct. at 304; *Raines,* 12 Cl.Ct. at 536; *Carruth v. United States,* 224 Ct.Cl. 422, 437, 627 F.2d 1068, 1076 (1980); *see also Hilo Coast Processing Co. v. United States,* 7 Cl.Ct. 175, 177 (1985). Consistent with the standard of judicial review, this court must determine based on the administrative record whether the ASCS's final determination of plaintiffs' status lacked a rational basis.

2. Custom Farming

■ DASCO determined that plaintiff Melvin Knaub through Knaub Farms had engaged in custom farming for his tenants, Mark and Mike, in both crop years 1987 and 1988. The administrative record reveals checks indicating that funds were paid by Mark and Mike to Knaub Farms for labor performed for Mark's and Mike's operations in 1987 and in 1988. DASCO applied the custom farming regulation, 7 C.F.R. § 795.16, and concluded that Melvin through Knaub Farms performed labor for Mark and Mike in violation of the regulation during both years. As stated earlier,

this court's function is to determine based on the administrative record whether DASCO's determination of plaintiffs' status lacked a rational basis. Copies of checks from Mark and Mike to Knaub Farms are clearly marked "labor," and it was reasonable for DASCO to conclude on this basis that Knaub Farms, through Melvin, custom-farmed land in which he and Knaub Farms had an interest in violation of the custom farming regulation. On appeal to DASCO, plaintiffs argued that labor was not provided by Melvin to Mark or Mike, but DASCO determined the facts otherwise. DASCO's determinations were rationally based on the administrative record.

3. Financing

■ DASCO determined that plaintiffs violated the financing regulation. The conclusion was based upon evidence in the administrative record that Melvin through Knaub Farms purchased farm supplies in bulk for his own operation and for Mark's and Mike's operations and allowed Mark and Mike to delay reimbursement to Knaub Farms until after the harvest. DASCO found that the deferred payments on supply purchases constituted commingling of finances by Mike, Mark and Melvin. In particular, the regulation provides that in order to be considered a separate "person," an individual or legal entity must be responsible for the cost of farming related to such interest from a fund or account separate from that of any other individual or entity. 7 C.F.R. § 795.3. Plaintiffs clearly purchased supplies out of a common fund.[6] The regulation provides that plaintiffs be combined as one person. In further support of plaintiffs' failure to keep their finances "separate and distinct" in crop year 1988, DASCO found that Mark and Mike used the same equipment as collateral for

---

**6.** This court does not doubt the integrity of plaintiffs and their desire to comply with the law. The court also understands the plaintiffs' argument that the regulations were not well adapted to the farming practices prevalent in their region, such as pooling funds to purchase bulk supplies at a discount. However, this court must apply the law as passed by Congress and the regulations as promulgated by USDA in effect at the times in question. The alleged

unsuitability of the law and regulations is not before this court, but is rather an issue to be resolved by Congress and USDA. In fact, Congress substantially revised the statutory scheme defining the term "person" for payment limitation purposes, but the statute was not effective until crop year 1989 and therefore does not apply to the plaintiffs' claims. *See* Omnibus Budget Reconciliation Act of 1987, Pub.L. No. 203, 100th Cong., 1st Sess. § 1302 (1987).

operating loans from the Production Credit Association in 1988.[7] The foregoing represents substantial evidence in the record to support DASCO's conclusion that the finances of Mark, Mike and Melvin were not separate and distinct as required by 7 C.F.R. § 795.3. Therefore, plaintiffs must be combined for payment limitation purposes for crop year 1987 and 1988.

*Estoppel*

Plaintiffs allege that by the time that DASCO determined that plaintiffs were one person for purposes of crop year 1987, they had completed crop year 1987 and were almost through with crop year 1988 as well. Plaintiffs argue that because their contracts were completed and plaintiffs detrimentally relied on the original finding by the Scotts Bluff County ASCS Committee, defendant should be equitably estopped from asserting the subsequent determinations of the ASCS as a defense to making individual payments. Plaintiffs also allege that they participated in the 1988 wheat and feed grain program, having relied to their detriment on the original administrative determinations that they were three persons.

■ Plaintiffs contend that their claim is based upon equitable estoppel. Defendant, on the other hand, contends that the theory upon which plaintiffs rely is promissory estoppel. As this court explained in *Durant*, 16 Cl.Ct. at 449–50, this distinction is crucial, because the Claims Court does not have jurisdiction under the Tucker Act, 28 U.S.C. § 1491, to consider promissory estoppel claims. "Promissory estoppel is a doctrine for enforcing promises which reasonably induce action or inaction and which are binding to the extent necessary to avoid injustice." *Id.* at 450. As stated by the United States Court of Appeals for the Ninth Circuit in *Jablon v. United States*, 657 F.2d 1064, 1068 (9th Cir.1981), "promis-

sory estoppel is used to create a cause of action, whereas equitable estoppel is used to bar a party from raising a defense or objection it otherwise would have, or from instituting an action which it is entitled to institute." *Id.* "Promissory estoppel is a sword, and equitable estoppel is a shield." *Id.*

In this case, plaintiffs are clearly using an estoppel theory to create a cause of action. Plaintiffs ask for money damages based upon their estoppel theory. As in *Durant*, "[t]he gravamen of plaintiffs' estoppel argument is that the government, acting through the County Committee, promised them payments as two 'persons' and that injustice can be avoided only by enforcing the alleged promise." 16 Cl.Ct. at 450. The only difference is that in the present case the plaintiffs seek to be counted as three "persons." As in *Durant*, this court does not have jurisdiction over plaintiffs' theory.[8]

■ Assuming *arguendo* that plaintiffs' action is based upon equitable estoppel, it would nevertheless fail to meet the elements of an equitable estoppel claim. These elements are:

(1) the party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must have relied on the former's conduct to his injury.

*Durant*, 16 Cl.Ct. at 451 (citing *Emeco Industries, Inc. v. United States*, 202 Ct.Cl. 1006, 1015, 485 F.2d 652, 657 (1973) (quoting *United States v. Georgia–Pacific Co.*, 421 F.2d 92, 96 (9th Cir.1970))).

In our case, plaintiffs entered into contracts that by their terms subjected their eligibility to further review. Plaintiffs were notified by letter that the initial deter-

**7.** Plaintiffs do not fall under the family members exception, 7 C.F.R. § 795.4 (1990), because they were not organized as separate units prior to December 31, 1985, *id.*

**8.** Plaintiffs' argument is not similar to that advanced in *United States v. Lazy FC Ranch*, 481 F.2d 985, 989 (9th Cir.1973). In that case, the

government instituted a suit to recover funds paid to defendants. Estoppel was used as a "shield" against the government's suit. *Id.* at 989–90. *Lazy FC Ranch* is unlike the present case in which plaintiffs attempt to create a cause on action based upon an estoppel theory.

mination of the county committee was subject to further review, and possible reversal, by the state committee and DASCO. The regulations also make clear that determinations of the county committee are not final.[9] Additionally, plaintiffs were informed by letter that the county committee's initial determination in 1987 was subject to specific conditions which plaintiffs were required to meet in order to be considered as three separate "persons." The county committee subsequently found that the plaintiffs had not abided by these conditions. While it was unfortunate that more than a year elapsed from the time of the initial determination to the time of DASCO's final decision, the initial determination would not have been reversed but for violations of the specific conditions set forth by ASCS. Plaintiffs could not reasonably rely on the county committee's initial determination, knowing that it was not final.

As to the second element, because both the plaintiffs and the county committee were aware that the state committee and DASCO had a right to review the initial determination, plaintiffs cannot argue that the county committee intended the plaintiffs to act upon its determination. The contract was subject to regulations under which plaintiffs were not eligible for multiple payments. Rather, plaintiffs knew, or should have known, that they could not rely on the county committee's determination. *See Federal Crop Insurance Corp. v. Merrill*, 332 U.S. 380, 384–85, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947). The risk of improper reliance in such circumstances lies with the plaintiffs. *Heckler v. Community Health Services*, 467 U.S. 51, 63, 104 S.Ct. 2218, 2225, 81 L.Ed.2d 42 (1984). Plaintiffs, as

participants in the ASCS program, are charged with knowledge of the applicable regulations. *See United States v. Batson*, 706 F.2d 657, 681 (5th Cir.1983). The elements of equitable estoppel have not been met.[10]

*Due Process*

Plaintiffs allege that defendant violated their procedural due process rights under the United States Constitution and seek money damages based on upon this alleged violation. The Claims Court does not have jurisdiction over claims for money based on an alleged violation of due process rights. *See, e.g., Cabrera v. United States*, 10 Cl.Ct. 219, 221–22 (1986); *Prevado Village Partnership v. United States*, 3 Cl.Ct. 219, 228 (1983); *Montalvo v. United States*, 231 Ct.Cl. 980, 982–83 (1982). This court does not have jurisdiction over the plaintiffs' due process claim.

## CONCLUSION

Based on the foregoing, defendant's motion for summary judgment is granted, and plaintiffs' cross-motion for summary judgment is denied. The Clerk of the Court shall dismiss the complaint. Each party will bear its own costs.

---

9. The regulations provide that "State and county committees, and representatives and employees thereof, do not have authority to modify or waive any of the provisions of the regulations of this part...." 7 C.F.R. § 713.2(b). The state committee has the responsibility to review and correct any action taken by the county committee that is inconsistent with the regulations. *Id.* at § 713.2(c). Furthermore, DASCO may review or modify any determination made by a state or county committee. *Id.* § 713.2(d).

10. Plaintiffs also argue that this court should grant equitable relief because the Secretary of

Agriculture is allowed to grant equitable relief, in his discretion, under certain circumstances. This court lacks jurisdiction under the Tucker Act, 28 U.S.C. § 1491, to grant the type of equitable relief which plaintiffs seek. Moreover, the granting of the relief that plaintiffs seek is clearly at the discretion of the Secretary of Agriculture. *See* 7 U.S.C. § 1379c(e) (1988); 7 C.F.R. §§ 790.2(a), (b), 795.24 (1990). This court's function, as stated earlier, is only to ascertain whether the determinations of the ASCS were rationally based upon the administrative record.