**RIVERCREST, A Partnership, and Petro–Resources, Inc.**

v.

**UNITED STATES, Defendant.**

**ARMSTRONG FARMS, A Partnership, and Custom Ag Services, Inc., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**Nos. 90–158C, 90–160C.**

United States Claims Court.

Nov. 12, 1991.

Pamela A. Ferrington, Natchez, Miss., for plaintiff.

William K. Olivier, Washington, D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, for defendant. Michael Knipe, U.S. Dept. of Agriculture, of counsel.

## OPINION

MARGOLIS, Judge.

These consolidated contract cases are before the court on the defendant's motion for summary judgment. The plaintiffs contracted with the defendant to grow wheat and in return receive payments under the defendant's price support program. The defendant determined that the plaintiffs did not plant winter wheat with a good faith intent to produce a normal harvest and thus materially breached their contracts with the defendant. The defendant withheld payments and denied disaster credit to the plaintiffs. The plaintiffs challenge the defendant's determinations as arbitrary and capricious, and seek damages equal to the amounts of disaster credit to which the plaintiffs claim they are entitled. The defendant argues that these determinations should be upheld because they are rationally based on the administrative record, and counterclaims to recover the outstanding balance of advanced deficiency payments made to the plaintiffs, with interest. After careful review of the administrative record, and after hearing oral argument, this court grants the defendant's motion for summary judgment.

## BACKGROUND

The Secretary of the United States Department of Agriculture ("USDA") is directed by the Agricultural Adjustment Act of 1938, *as amended*, 7 U.S.C. § 1281 *et seq.* (1982), to carry out price support and production adjustment programs through the Commodity Credit Corporation ("CCC"). Operation of these programs is administered through the USDA's Agricultural Stabilization and Conservation Service ("ASCS"). *Raines v. United States*, 12 Cl.Ct. 530, 532 n. 1 (1987). Three levels of authority exist under the ASCS. *Id.* On the local and state levels, programs are administered by county and state ASCS committees. 7 C.F.R. § 713.2 (1987). On the federal level, the Deputy Administrator, State and County Operations ("DASCO") supervises the state committees. *Id.*

Under the wheat and feed grain programs, price and income support is available to a producer in the form of nonrecourse loans and direct (deficiency and diversion) payments. *See* 7 U.S.C. §§ 1445b-2, 1445b-3, 1461–69; *see generally* 7 U.S.C. § 1421 *et seq.* The regulations applicable to these programs are set forth in 7 C.F.R. Parts 713 and 1421. The producer must sign a contract to participate in the program. 7 C.F.R. § 713.49–50. The general terms of the contract provide that the producer agrees to take the necessary steps to control the product of the specified crops, and the CCC agrees to provide certain forms of income and price support benefits to the producer. *Id.* § 713.49. The contract requires that the producer indicate the amount of acres the producer will plant in all commodities, and the amount of acres the producer will set aside from production. If a producer violates or fails to carry out the contract, the producer is not eligible to receive the payments due under the contract and must refund any overpayment to the CCC. *Id.* § 713.103(b), (e).

Deficiency payments are payments made to producers of program crops that represent the difference between the "target price" of the crop as established by the 1949 Act and the CCC commodity loan rate. *See* 7 C.F.R. § 713.108. A producer is an individual or entity that shares in the risk of producing an agricultural commodity. *Id.* § 713.3(u). A producer is paid an amount per acre to idle a percentage of the producer's base acres in an acreage diversion program. Base acres are determined by the producer's history of planted acres over a five year revolving period. *See id.* §§ 713.53, 713.108. The producer may request a portion of the payments be paid early in the crop year. These are called "advance deficiency payments." *Id.* § 713.104. Otherwise, payments are made at the end of the crop year.

The amounts of a producer's deficiency and diversion payments depend upon the number of acres devoted to actual crop production. This acreage total is determined by averaging the annual acreage devoted to the crop over the five year base period prior to the current year. The five year average revolves each year, and is

known as the producer's "crop acreage base." *Id.* §§ 713.4, 713.7. Hence, when a crop fails, resulting in zero production for the crop year, a producer's acreage base will be reduced because the inclusion of the failed crop year in the revolving five-year average. A producer, however, can avoid the loss of crop average base by applying for disaster credit with the county ASCS committee. *Id.* § 713.105. There are two forms of disaster credit, failed acreage and prevented planting credit. *Id.* The denial of failed acreage credit is at issue in these cases.

Approved disaster credit for the failed crop year will ensure that the producer's price support payments for the next crop year are not reduced because the assigned acreage has been reduced. The effect of the award of disaster credit is to preserve the producer's crop acreage base because the acres of failed crop are constructively considered to have been fruitful and harvested. However, for a producer to qualify for this failed acreage credit, the ASCS county committee must determine that the crop was planted "with the *reasonable expectation of producing a crop* and was damaged and destroyed by a natural disaster or other condition beyond the producer's control ..." *Id.* § 713.105(c) (emphasis added). DASCO determines which practices coincide with the requirement of planting with a reasonable expectation of producing a crop. *Id.* § 713.105(c), (d)(2).

### FACTS [1]

Plaintiff Rivercrest, a partnership, is the owner of a farm identified as Farm Serial Number ("FSN") 7. Rivercrest is the successor to Thomas K. Armstrong, who was involved in the administrative appeals. Plaintiff Petro–Resources, Inc. ("Petro") was the producer on FSN 7. Armstrong Farms, a partnership, is the operator of a farm identified as FSN 173. Armstrong Farms is the successor to Armstrong Farms, Inc. Custom Ag Services, Inc. ("Custom Ag") was the producer on FSN 173. The two farms are located in Adams

County, Mississippi, and are both adjacent to the Mississippi River.

The winter wheat crops on both FSN 7 and FSN 173 were enrolled in the 1987 Price Support and Production Adjustment Program. Prior to the 1987 crop year, wheat was not normally planted on these farms. Only soybeans had been grown on either farm since 1982. The land comprising both of these farms was classified as "high risk" and crops grown on such land are generally considered uninsurable, unless special approval is received from a field actuarial office. Wheat was planted on the farms six days after the end planting date of November 30, 1986. The plaintiffs claim that they planted late in reliance on the assurances of the county ASCS executive director that the plaintiffs would remain eligible to participate in the program. Both the winter wheat crops were planted by aerially sowing wheat seeds after the leaves of the soybean crops, which previously were planted on the farms, had dropped to the ground, and the wheat seeds were not tilled into the ground.

The plaintiffs filed applications for disaster credit for the failed wheat crop on the lands in question. The county ASCS committee initially granted credit on the ground that "regardless of the method of planting, given the conditions that existed on these particular farms this year, the wheat would have failed." However, the state committee, when requested to issue an instructional opinion on the two applications, directed the county committee to reconsider its decision because of the circumstances involved. The state committee's recommendation was based on the following: (1) 1987 was the first year wheat had been planted on the farms since 1982 (and the 1982 wheat crop failed); (2) soybeans had been planted each year since 1982; (3) the 1987 wheat crop was not planted until December 6, 1986, after the normal seeding date for the area; and (4) the wheat was flown on after soybean leaf drop without being incorporated into the soil. The county committee then denied the applications

---

**1.** The facts in this case are adapted from the administrative record which is the basis of review by this court. *See* discussion, *infra,* concerning the standard of review.

for disaster credit by a notice dated July 6, 1987.

The plaintiffs appealed to the state committee, and on August 28, 1987 the state committee sustained the county committee's decision to deny the applications. The state committee noted in doing so that the wheat was not planted in a normally acceptable way for late-seeded wheat, and the wheat was planted on land subject to inundation by the Mississippi River and on land not normally associated with the growing of winter wheat as indicated by the cropping history.

The plaintiffs then appealed to DASCO and a hearing was held by telephone. DASCO issued a final decision on December 30, 1987 affirming the state committee's decision and additionally noting that: (1) the land seeded with wheat was in a high risk area for crop insurance; (2) only late spring seeded crops are usually produced along the Mississippi River in Adams County, Mississippi; and (3) the wheat was not planted timely, and the wheat seeds were sowed after the leaves from the previous soybean crop had dropped to the ground.

On July 15, 1987, the plaintiffs signed amended contracts for participation in the Optional Acreage Diversion Program (O/92) for the 1987 crop year. In this program, producers can elect to devote all or a portion of their crop acreage base to conserving uses and receive payments on an acreage not to exceed 92 percent of the crop acreage base. The payment rate for land covered by the O/92 program is 92 percent of the normal deficiency payment paid to a participant in the Price Support and Agricultural Production Program. 7 C.F.R. § 713.53. The result of participation in the O/92 program is an increased deficiency payment.

FSN 7 enrolled 319.6 acres. As a result, Thomas K. Armstrong, then owner of FSN 7, received a total of $5,361.64 in advance deficiency payments and Petro, operator of FSN 7, received $16,084.91 in advance deficiency payments. FSN 173 enrolled 269 acres in the diversion program. As a result, Armstrong Farms, Inc., owner of FSN 173, received $4,369.51 in advance deficiency payments and Custom Ag Services, Inc., operator of FSN 173, received $13,108.54 in deficiency payments.

Thomas K. Armstrong and Armstrong Farms, Inc. repaid CCC the full amount of advance deficiency payments that they received. Petro repaid $457.16 of the advance payments to CCC, and CCC withheld $6,502.65 in other payments that it owed to Petro, resulting in a balance which the government contends is owed by Petro of $9,125.10. Custom Ag Services, Inc. repaid $401.34 of the deficiency payments to CCC, and CCC withheld $5,407.02 on other payments that it owed to Custom Ag, resulting in a balance which the government contends is owed by Custom Ag of $7,300.18.

## DISCUSSION

The issues presented are what is the standard of review of ASCS determinations; whether the determination by the ASCS that the late plantings of wheat were not reasonably calculated to produce normal harvests lacked a rational basis; whether the defendant is estopped from asserting the ASCS determinations as a defense to honoring the contracts between the plaintiffs and defendant; and whether Petro and Custom Ag must repay the advance deficiency payments made to them.

*Standard of Review*

The Claims Court has jurisdiction to review ASCS determinations concerning price support and crop reduction programs to the extent that the plaintiffs are making a claim for money damages under the Tucker Act, 28 U.S.C. § 1491(a)(1). *Knaub v. United States*, 22 Cl.Ct. 268, 274 (1991); *Willson v. United States*, 14 Cl.Ct. 300, 304 (1988); *Raines*, 12 Cl.Ct. at 534. Review of the legal determinations made by the ASCS is available, but this court's "role in reviewing administrative determinations under section 1429 is concededly 'very limited,' but not nonexist[ent]: we need not consider the wisdom of the decisions, but must scrutinize whether the officials acted rationally and within their statutory authority." *Willson*, 14 Cl.Ct. at 304 (quoting *Raines*, 12 Cl.Ct. at 536 (citations omit-

ted)); *see Durant v. United States*, 16 Cl.Ct. 447, 452–53 (1988).[2] Furthermore, section 1385 precludes review of the factual findings made by the agency.[3] *See Knaub*, 22 Cl.Ct. at 274. However, legal determinations made by the ASCS, including whether a decision is arbitrary and capricious, are subject to review. *Id.*

An agency's interpretation of an administrative regulation is entitled to deference. *Id.* The agency interpretation " 'becomes of controlling weight unless it is plainly erroneous or inconsistent with law.' " *Id.* The plaintiffs do not argue that the ASCS interpretation of the regulations is contrary to the statute establishing the crop reduction program. Rather, the question in these cases is whether the application of these regulations to the plaintiffs is erroneous and unsupported by the facts. Therefore, the standard for judicial review is " 'whether the decision was based on a consideration of the relevant facts and whether there has been a clear error of judgment.' " *Id.* at 275. This court's function is to review the facts as determined by ASCS and to ascertain whether a rational basis in the administrative record underlies the decision reached. Consistent with the standard of judicial review, this court must determine based on the administrative record whether the ASCS's final determination regarding the plaintiffs lacked a rational basis. *Id.*

*Review of DASCO's Determinations*

█ In this case, the plaintiffs, by planting after the end planting date, assumed the burden of demonstrating to DASCO that a normal crop was intended, *i.e.*, that planting was reasonably calculated to produce a normal harvest, and that circumstances beyond their control intervened. 7

C.F.R. § 713.105(c). DASCO sustained the decision of the state committee denying the applications for disaster credit, and DASCO specifically noted the following facts to support its conclusion: (1) that the land seeded with wheat was in a high risk area for crop insurance; (2) that only late spring seeded crops are usually produced along the Mississippi River in Adams County, Mississippi; and (3) that the wheat was not planted timely, and the wheat was seeded after the leaves from the previous soybean crop had dropped to the ground. Additionally, DASCO noted the facts found by the state committee in denying the plaintiffs' appeal of the county committee's decision: that the wheat was not planted in a normally acceptable way for late-seeded wheat, and the wheat was planted on land subject to inundation by the Mississippi River and on land not normally associated with the growing of winter wheat as indicated by the cropping history. DASCO also noted the facts found by the state committee in recommending to the county committee that the applications be denied: (1) 1987 was the first year wheat had been planted on the farms since 1982 (and the 1982 wheat crop failed); (2) soybeans had been planted each year since 1982; (3) the 1987 wheat crop was not planted until December 6, 1986, after the normal seeding date for the area; and (4) the wheat was flown on after soybean leaf drop without being incorporated into the soil.

On the basis of the findings of fact as determined by DASCO—including the risky nature and crop history of the land and the timing and method of planting—it was rational for DASCO to conclude that the late plantings of wheat on the farms in question were not reasonably calculated to produce a normal crop and that the plaintiffs

**2.** Section 1429 provides in pertinent part:
    Determinations made by the Secretary under this Act shall be final and conclusive: *Provided,* That the scope and nature of such determinations shall not be inconsistent with the provisions of the Commodity Credit Corporation Charter Act.
    7 U.S.C. § 1429 (emphasis in original).

**3.** Section 1385 provides in pertinent part:
    The *facts* constituting the basis for any ... payment under the ... wheat, feed grain ...

programs authorized by the Agricultural Act of 1949 and this Act [Agricultural Adjustment Act of 1938], any loan or price support operation, or the amount thereof, when officially determined in conformity with the applicable regulations prescribed by the Secretary or by the Commodity Credit Corporation, shall be final and conclusive and shall not be reviewable by any other officer or agency of the Government.
    7 U.S.C. § 1385 (emphasis added).

are not eligible for disaster credits for crop year 1987. The plaintiffs submitted affidavits to this court concerning local farming practices in an attempt to refute these findings of fact upon which DASCO's legal determination is based, but DASCO determined the facts otherwise. It is not the function of this court to review the agency's findings of fact. Rather, as stated earlier, this court's function is to determine based on the administrative record whether DASCO's determination that the plaintiffs are ineligible for disaster credit lacked a rational basis.[4] This court holds that DASCO's determination is rationally based on the administrative record.

*Equitable Estoppel*

■ The plaintiffs argue that they relied to their detriment on the initial advice of the ASCS county director prior to the planting of the 1987 winter wheat crop and that the government should now be equitably estopped from asserting the ASCS determinations as a defense to honoring the contract between the plaintiffs and the government. The elements of an equitable estoppel claim are:

(1) the party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must have relied on the former's conduct to his injury.

*Knaub*, 22 Cl.Ct. at 276.

The plaintiffs could not have reasonably relied upon any action by either the ASCS county director or the county committee. The regulations make clear that "[s]tate and county committees, and representatives and employees thereof, do not have authority to modify or waive any of the provisions of the regulations of this part...." 7 C.F.R. § 713.2(b). The state committee has the responsibility to review and correct any action taken by the county committee that is inconsistent with the reg-

ulations. *Id.* § 713.2(c). Furthermore, DASCO may review or modify any determination made by a state or county committee. *Id.* § 713.2(d). The plaintiffs could not reasonably rely on the advice of the county director nor on the county committee's initial determination, knowing that neither was final.

As to the second element, because both the plaintiffs and the county committee and its director were aware that the state committee and DASCO had a right to review the county committee's determinations, plaintiffs cannot argue that the county committee or the director intended the plaintiffs to act upon the county committee's initial determination or upon the director's advice. Rather, plaintiffs knew, or should have known, that they could not rely on the county committee's determination or upon the advice of the county committee director. *See Federal Crop Insurance Corp. v. Merrill*, 332 U.S. 380, 384–85, 68 S.Ct. 1, 3–4, 92 L.Ed. 10 (1947). The risk of improper reliance in such circumstances lies with the plaintiffs. *Heckler v. Community Health Services, Inc.*, 467 U.S. 51, 63, 104 S.Ct. 2218, 2225, 81 L.Ed.2d 42 (1984). The plaintiffs, as participants in the ASCS program, are charged with knowledge of the applicable regulations. *See United States v. Batson*, 706 F.2d 657, 681 (5th Cir.1983). The elements of equitable estoppel have not been met.

*Refund of Advanced Deficiency Payments*

■ All deficiency payments made by the CCC to the plaintiffs were in consideration for their following normal cultivation practices and producing a normal crop. 7 C.F.R. § 713.105(c). As stated earlier, advance deficiency payments were made to the plaintiffs prior to completion of the harvest. However, consistent with earlier portions of this opinion, this court holds that the plaintiffs breached their contracts with the CCC by not producing a normal crop, failing to qualify for disaster credit,

---

**4.** The plaintiffs also argue that additional discovery is necessary to determine whether the District Director improperly influenced the county and state committee's actions and was motivated by the involvement of O.J. Oliveaux.

The court rejects this argument. DASCO's legal conclusion that the plaintiffs are not entitled to disaster credit is rationally based on the administrative record, not on bad faith or improper motives. Additional discovery is not necessary.

and planting crops of wheat without a reasonable expectation of normal harvests. 7 C.F.R. § 713.103(b), (e). Therefore, CCC is entitled to the return of any outstanding advance deficiency payments made to the plaintiffs.

Thomas K. Armstrong and Armstrong Farms, Inc. repaid CCC the full amount of advance deficiency payments that they received. Petro repaid $457.16 of the advance payments to CCC, and CCC withheld $6,502.65 in other payments that it owed to Petro, resulting in a balance owed by Petro of $9,125.10. Custom Ag Services, Inc. repaid $401.34 of the deficiency payments to CCC, and CCC withheld $5,407.02 on other payments that it owed to Custom Ag, resulting in a balance owed by Custom Ag of $7,300.18. The balance of $9,125.10 owed by Petro and the balance of $7,300.18 owed by Custom Ag are subject to interest at an annual rate of 13 percent from July 20, 1988. 7 C.F.R. § 713.104(d)(2).[5]

### CONCLUSION

The determinations of DASCO that the plaintiffs' late plantings of wheat on the farms in question were not reasonably calculated to produce normal harvests and that the plaintiffs are not eligible for disaster credits for crop year 1987 are rationally based upon the administrative record. The elements of the plaintiffs' equitable estoppel claim are not met. Two of the plaintiffs shall return the advanced deficiency payments paid to them by the government, with interest. Accordingly, the defendant's motion for summary judgment is granted. The Clerk is directed to dismiss the plaintiffs' complaints. The Clerk is also directed to enter judgment in favor of the United States on its counterclaims against plaintiff Petro–Resources, Inc. in the amount of $9,125.10, plus interest at the rate of 13 percent per annum from July 20, 1988, and against plaintiff Custom Ag

Services, Inc. in the amount of $7,300.18, plus interest at the rate of 13 percent per annum from July 20, 1988. Each party will bear its own costs.

**5.** Pursuant to 7 C.F.R. § 713.104(d)(2):
   Interest shall be computed from the date of issuance of the payment to the date such payment is refunded. The rate of interest shall be the rate of interest in effect for CCC commodity loans on the date of the issuance of the payment.

The rate of interest in effect for CCC commodity loans upon the date of the issuance of payments to the plaintiffs was 13 percent. 7 C.F.R. § 1403.5; CCC Rate of Interest on Delinquent Debts, 48 Fed.Reg. 3639 (1983).