**XXX CONSTRUCTION CO., INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 110–82C.**

United States Claims Court.

March 15, 1989.

---

Thomas C. Howser, Ashland, Or., with whom was Judith H. Uherbelau, for plaintiff.

Sharon Y. Eubanks, Washington, D.C., with whom was Asst. Atty. Gen. John R. Bolton, for defendant.

## OPINION

RADER, Judge.

In this action under the Contract Disputes Act of 1978, 41 U.S.C. §§ 601–613 (1982 & Supp. III, 1985), plaintiff, XXX Construction Company, Inc. (plaintiff or XXX Construction), seeks payment for reclaiming 116 acres of Forest Service land. In 1980, the Government awarded plaintiff a contract to perform reclamation work on 45 acres in the Rogue River National Forest. After completing its contract work, plaintiff claimed to have actually worked on 165 acres. The contracting officer, however, denied plaintiff's claim for an adjustment. The contracting officer reasoned that plaintiff should have understood the need to work on as many as 165 acres to reclaim the 45 acres. Plaintiff appealed to this court.

The case is now before the court on cross-motions for summary judgment. This court grants plaintiff's motion for summary judgment. Plaintiff's damages request, however, is not reasonable. The court awards damages according to the formula in the contract.

## FACTS

The parties do not contest any material facts. In August 1980, the United States Forest Service (Forest Service or Service), requested bids for windrow reclamation and land clearing on 175 acres in the Rogue River National Forest, Jackson County, Oregon. The 175 acres consisted of three units of land—Snowshoe (106 acres), Cathill (15 acres), and Gypsy Fork (54 acres). The Snowshoe and Gypsy Fork units needed windrow reclamation. The Cathill unit required clearing.

The Forest Service uses the brush field reclamation process to start new areas of forest and to provide sites for experimental planting. When clearing land under this process, the Service erects windrows to protect against wind erosion. Windrows are long piles of dead brush, uprooted ground vegetation, and debris. The windrows range in height from two to five feet above average ground level. After several years, the Forest Service reclaims land by scattering the windrow debris over the cleared area. This redistribution of the windrows restores the land to its original contours.

In this case, the windrows covered 30 acres or about 25% of the cleared land. In August 1980, the Service issued a request for bids to redistribute the windrows on the Snowshoe and Gypsy Fork units. The request also included the clearing of 15 acres in the Cathill unit.

After a month, the Forest Service received two offers, including plaintiff's bid of $110.00 per acre. Both bids exceeded Forest Service estimates. Therefore, the Service asked the bidders to submit new bids based on 45 acres of work, rather than the entire 175 acres. XXX Construction gained the contract for 45 acres with a bid of $91.00 per acre.

On September 22, 1980, the Service issued a purchase order to XXX Construction for "Machine Site Preparation by windrows reclamation and/or land clearing" on 45 acres. The purchase order stated that plaintiff would be paid $91.00 per acre for a total contract price of $4095.00. Attached

to the purchase order were 13 pages of specifications. The purchase order and the attached specifications established the contract between the parties.

The specifications included five pages of typewritten instructions discussing the nature of the brush field reclamation project, a detailed summary sheet describing each unit, two drawings of land profiles before and after windrow redistribution, and four pages of maps identifying each of the units. These specifications provided maps and descriptions of the entire 175 acres. At no point, however, did the specifications state which 45 acres were to be worked.

On September 29, 1980, the Service began erecting survey flags to designate the boundaries of the project. The next morning plaintiff's employee began work with the bulldozer. XXX Construction performed windrow reclamation and land clearing work as directed on all three units of the National Forest. Plaintiff's driver strictly followed the flags set out by the Service. According to these directions, plaintiff's driver did not work 10 of the 175 acres which the Service considered too steep for safe labor. Otherwise, plaintiff completed work on the 165 acres. As work on the project was nearing completion on October 16, 1980, XXX Construction's employee told the Forest Service personnel that the work covered more than 45 acres. Plaintiff's driver completed the project on schedule three days later.

When plaintiff learned of the actual acreage worked, it complained to the contracting officer. In a letter dated October 27, 1980, plaintiff's secretary stated:

> I have just finished discussing the ground covered with my tractor driver and he has advised me that the district instructed him to do the full 175 Acres as we originally bid, (except for approximately 10 Acres deleted), not the 45 Acres which the district represented was

all that was to be done when they [contracted with] us.

The letter further demanded payment for work performed on 165 acres.

A dispute arose between the parties. XXX Construction claimed entitlement to payment for the entire 165 acres on which it had performed work. Defendant consented to pay only for 45 acres of work. This 45 acres included the land actually reclaimed from beneath the windrows, plus the land cleared in the Cathill unit.

In response to plaintiff's complaint, the Forest Service remeasured the windrows and determined that they covered 34.4 acres, rather than 30. Thus, defendant agreed to pay plaintiff for 49.4 acres. On November 14, 1980, the Forest Service prepared a contract modification to reflect this revision. The letter accompanying the modification directed plaintiff that the Government would not process payment for the entire project until it received signed copies of the modification, the final pay estimate, and the contract release forms. XXX Construction's representative signed and returned the contract modification on December 1, 1980, without comment.

On December 3, 1980, plaintiff returned the contract release form. On the contract release, in handwriting, plaintiff specifically reserved a "claim for acres worked and unpaid for as set forth in letter to contracting officer Arnold J. Windmer dated 10/27/80." Upon receipt of payment for 49.4 acres, plaintiff submitted a claim for payment on the additional 116 acres.[1]

The contracting officer denied plaintiff's claim on February 27, 1981. The contracting officer concluded that XXX Construction was only entitled to payment for the acres actually covered by the windrows and "the area immediately adjacent to the windrows...." Plaintiff then filed this action

---

1. The difference between 49.4 acres (for which plaintiff has received payment) and 165 acres (for which plaintiff claims payment) is 115.6 acres. The parties consistently have rounded this figure to 116 acres.

Although the contracting officer's decision refers both to plaintiff's claim "for 110 acres of

additional work" and to the "116 acres of additional work," Def. Brief filed Sept. 16, 1987, App. at 6–9, all other documents filed by the parties consistently refer to 116 acres of additional work.

in the United States Court of Claims, this court's predecessor. On October 15, 1988, this court received this case, with its pending motion, for resolution.

Based on these undisputed facts, plaintiff claims entitlement to payment for work performed on 165 acres, representing the 150 acres over which the windrow debris was redistributed and 15 acres of clearing in the Cathill unit. Plaintiff argues that the contract was ambiguous. Moreover, according to plaintiff, this ambiguity should be construed against the Government.

In support of its motion for summary judgment, defendant asserts that plaintiff has already received full payment for 49.4 acres, which represents the area actually covered by the windrows (34.4 acres), plus the Cathill unit work. The contract, in defendant's view, was not ambiguous and required plaintiff to work within the entire 165 acres to redistribute the windrows and clear the Cathill unit. If the contract was ambiguous, however, defendant contends that the ambiguity was patent and glaring. Thus, according to defendant, plaintiff had a duty to clarify any ambiguity before entering the contract. In addition, defendant contends that plaintiff's claim is barred by the doctrine of accord and satisfaction.

The court must both interpret the contract and apply the accord and satisfaction doctrine. To interpret the contract, the court must first ascertain if the contract provisions were ambiguous. In the event that the court rules that the contract contains an ambiguity, then the court must determine whether defendant bears responsibility for drafting a latent ambiguity or whether plaintiff bears responsibility for failing to investigate a patent ambiguity.

As a separate issue, the court must ascertain whether an accord and satisfaction occurred. Finally, this case also presents an issue about the measure of damages.

## DISCUSSION

Pursuant to RUSCC 56(b), both parties have moved for summary judgment. Each party has asserted the absence of any gen-uine issue of material fact and claimed entitlement to judgment as a matter of law. This court agrees that the material facts of this case are not in dispute. Further litigation in this case would only put the parties and the court to unnecessary expense. *Industrial Indem. Co. v. United States*, 14 Cl.Ct. 351, 355 (1988). Therefore, this case fits well within the Supreme Court's counsel: "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole which are designed to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 1, which is identical to RUSCC 1(a)(2)).

### I. *Ambiguity*

This court must first interpret the contract between the parties. Specifically, this court must determine whether the contract required plaintiff to work on the entire 165 acres when disbursing the 30 acres of windrow debris and clearing 15 acres of the Cathill unit. Contract interpretation is a matter of law. *Fortec Constructors v. United States*, 760 F.2d 1288, 1291 (Fed. Cir.1985).

When interpreting a contract, the court must give the language "that meaning that would be derived from the contract by a reasonably intelligent person acquainted with the contemporaneous circumstances." *Randallstown Plaza Assocs. v. United States*, 13 Cl.Ct. 703, 706 (1987) (quoting *Hol–Gar Mfg. Corp. v. United States*, 169 Ct.Cl. 384, 388, 351 F.2d 972, 975 (1965)). To perform this function, the court frequently must place itself in the shoes of a reasonable contractor confronted with the same language and circumstances. *Firestone Tire & Rubber Co. v. United States*, 195 Ct.Cl. 21, 30, 444 F.2d 547, 551 (1971); *Grimberg Co., Inc. v. United States*, 7 Cl.Ct. 452, 456, *aff'd mem.*, 785 F.2d 325 (Fed.Cir.1985).

The purchase order features the contested contract language in this case. Under the heading "Description," the order states

that XXX Corporation must perform "Machine Site Preparation by windrow reclamation and/or land clearing." Immediately alongside this description, another column specifies a quantity of 45 acres. Reading these items together, a reasonable contractor would expect to reclaim and clear 45 acres. This language does not state that the contractor would be required to perform work on 165 acres to accomplish the reclamation and clearance project. This terse language is the genesis of the ambiguity in this contract.

The remainder of the contract language does not resolve the ambiguity. Beneath the terse provisions, the order states that "work is to be performed in accordance with: Attached specifications." The thirteen pages of specifications do not clarify which 45 acres the contractor is obligated to work.[2] The only reference to a specific number of acres appears on page seven entitled "Detailed Unit Summary Sheet." This page, however, merely describes each of the three units—Snowshoe, Cathill, and Gypsy Fork—and includes their total acreage. This document does not identify the 45 project acres. Instead, it merely describes the three units. Similarly, the vicinity map describes the entire boundaries of each of three units. The map does not designate which 45 of the entire 175 acres encompassed by the units belonged in the work project.

The quantity item of 45 acres on the face of the purchase order is ambiguous. Plaintiff takes the position that this quantity item, in conjunction with the language of the contract specification, may be reasonably interpreted in at least two ways: (1) Plaintiff should work only 45 of the 175 acres, and receive payment for that amount; or (2) plaintiff should work the entire 175 acres, and receive payment for the 45 acres covered by the windrows and the clearing project. Plaintiff read the provision to only require 45 acres of work. Therefore, when the Service directed plaintiff to work on 165 acres, plaintiff became equitably entitled to enhanced compensation. Defendant reads the provision to require plaintiff to work on 165 acres, but receive pay for 45 acres of windrow reclamation. When a contract provision may be reasonably interpreted in at least two ways, it is ambiguous. *Sun Shipbuilding & Dry Dock Co. v. United States*, 183 Ct.Cl. 358, 372, 393 F.2d 807, 815–16 (1968); *Bennett v. United States*, 178 Ct.Cl. 61, 64, 371 F.2d 859, 861 (1967); *Grimberg*, 7 Cl.Ct. at 458.

When the contract language presents an ambiguity, the court appropriately may consider the conduct of the parties and the circumstances attending the transaction for clarification. *Chris Berg, Inc. v. United States*, 197 Ct.Cl. 503, 514, 455 F.2d 1037, 1044 (1972). The circumstances surrounding formation of this contract compound, rather than dispel, the ambiguity. Plaintiff had already bid once before on "[m]achine site preparation by windrow reclamation and/or land clearing"—a description identical to the contract—for the entire 175 acres.[3] The Service rejected plaintiff's bid

---

**2.** The general specifications fall into four divisions with separately numbered paragraphs. Division 100 contains a subsection entitled "Location and Description." Paragraph 122 of this subsection refers the contractor to the "Attached Detailed Unit Information Summary for Specific Information." Otherwise, this division makes no reference to the acreage to be worked. Division 200 entitled "Technical Specifications" deals exclusively with proper methods of land clearing and windrow reclamation. This division makes no reference to the number of acres in the project. Division 300, entitled "Inspection and Acceptance," sets forth procedures for determining whether work is satisfactory. Division 300 does not provide any guidance about which units and acres were part of the 45 project acres. Division 400 provides instructions on measurement and payment. Paragraph 421 states that payment "will be made on a per-acre basis by subitem." Notably, the purchase order was for a bulk quantity of 45 acres and did not divide the acres into subitems among the Gypsy Fork, Cathill, and Snowshoe units.

**3.** The form for the rejected bid and the purchase order that formed the contested contract are substantially similar. Both use identical language to describe the work. The rejected bid, however, lists a quantity of 175 acres divided among the three units as follows:

| | | |
|---|---|---|
| 1.1 | Snowshoe Unit | 106 ac |
| 1.2 | Cathill Unit | 15 ac |
| 1.3 | Gypsy Fork | 54 ac |

of $19,250.00 at $110.00 per acre. When the Service requested bids a second time on the same units, it listed only 45 as the project acreage.[4] Plaintiff reduced its bid to $4095.00 at $91.00 per acre. Plaintiff's reduction of its second bid to less than 25% of the original bid is consistent with the expectation that it would do about 25% of the original work.

Defendant states that the Service's first and second requests for bids covered identical work.[5] Yet the Service did not detect the misunderstanding even when plaintiff's second bid was less than 25% of its first bid. In fact, plaintiff's second bid was less than 50% of the Service's estimate for the project. The Service had estimated in advance that the project would cost $8750.00 or $50.00 per acre for 175 acres. The Service apparently expected plaintiff to do exactly the same work in the second bid as in the first for less than 25% of the original bid amount. These circumstances further underscore the ambiguity in the purchase order's designation of 45 acres as the quantity of the project work. Plaintiff's second price quote, however, shows that it construed the 45–acre designation to mean that the second bid request covered only a small portion of the original bid's acreage.

The purchase order language governing quantity is ambiguous. The remainder of the contract specifications does not clarify that ambiguity. Moreover, the conduct of the parties evinces misunderstanding and conflicting interpretations of the ambiguous provision.

## II. *Patent v. Latent*

This court must next determine whether the ambiguity was patent or latent. In determining whether the ambiguity was patent or latent, the question "is not the actual knowledge of the contractor, but the obviousness of the discrepancy [in the contract terms] which imposes the duty of inquiry." *Chris Berg*, 197 Ct.Cl. at 515, 455 F.2d at 1045. A patent or glaring ambiguity would impose "an affirmative duty on plaintiff to seek clarification [from the designated Government agency] prior to submitting its bid." *Enrico Roman, Inc. v. United States*, 2 Cl.Ct. 104, 107 (1983). If plaintiff had failed to clarify a patent ambiguity, then it would forfeit the opportunity to rely upon its unilateral interpretation of the contract. *Cherry Hill Sand & Gravel Co. v. United States*, 8 Cl.Ct. 757, 762 (1985); *MWK Int'l., Ltd. v. United States*, 2 Cl.Ct. 206, 210 (1983).

A latent ambiguity, on the other hand, "should be resolved against the party who drafted the contract." *Chris Berg*, 197 Ct.Cl. at 514, 455 F.2d at 1044; *Big Chief Drilling Co. v. United States*, 15 Cl.Ct. 295, 301 (1988). This familiar rule "is subject to the condition that the alternative interpretation tendered by the other party be a reasonable one." *William F. Klingensmith, Inc. v. United States*, 205 Ct.Cl. 651, 657, 505 F.2d 1257, 1261 (1974) (per curiam); *Grimberg*, 7 Cl.Ct. at 456. "The alternative interpretation need only be within a 'zone of reasonableness,' [with] the Government shouldering 'the major task of seeing that ... the words of the agreement communicate the proper notions....'" *Grimberg*, 7 Cl.Ct. at 456 (quoting *WPC Enters., Inc. v. United States*, 163 Ct.Cl. 1, 6, 323 F.2d 874, 876–77 (1963)).

■ The purchase order ambiguity was not glaring and patent. Therefore, plaintiff had no duty to inquire. *See, e.g., Newsom v. United States*, 230 Ct.Cl. 301, 303, 676 F.2d 647, 650 (1982). The purchase order provision specified that the quantity

---

The purchase order merely lists the bulk quantity of 45 acres without designating units.

**4.** The contracting officer's decision notes: "when the quoters were requested to resubmit their quotations, it was explained to the quoters that there were only 30 acres of actual work to be performed in those two sub-items. It must be assumed that the resubmitted quotations were made on that basis." This 30–acre figure rises to 45 with the addition of the 15 acres of clearing in the Cathill Unit.

**5.** The contracting officer's decision states: "Since the quotations received were unacceptably high, the two quoters ... were requested to visit the work sites ... and submit revised quotations." Thus, the Service explained that it had invited the quoters to bid a second time on the same work.

of reclaiming and clearing work was 45 acres. This work was "to be performed in accordance with" the attached specifications. The attached specifications, however, merely described the character of the entire 175 acres within the three units. The specifications did not designate the 45 project acres.[6]

Defendant contends that the 45–acre quantity on the face of the contract patently clashes with the "175–acre amount listed in the specifications." Def. Brief filed Sept. 16, 1987, at 11. The 175–acre amount is buried seven pages deep in the specifications on the "Detailed Unit Summary Sheet." The original rejected bid request included an identical copy of this page. Therefore, plaintiff, in light of the 75% reduction on the face of contract, justifiably read this page to describe the entire units of which only 45 acres would comprise the project. The contract supports this reasonable interpretation.

The purchase order also stated that "work is to be performed in accordance with ... terms and conditions of purchase order as supplemented." Thus, plaintiff anticipated supplementary instructions for contract performance. The purchase order also designated Tom Scriven, Butte Falls Ranger District, as the contracting officer's representative who would "set up a prework conference." Plaintiff reasonably read this language to mean that the prework conference would supply supplemental instructions concerning which 45 acres would fall within the project. Plaintiff detected no ambiguity and perceived no need to inquire, because the purchase order specified that supplemental instructions would come. Plaintiff reasonably expected those instructions to designate which 45 of the 175 acres were within the project.

The Service did provide supplemental instructions. The Service's personnel placed survey flags to designate the work areas. These work areas, however, encompassed far more than 45 acres. Plaintiff did not learn that the Service interpreted the purchase order quantity provision differently until the project was complete. The quantity item on the face of the purchase order was a latent ambiguity. Moreover, plaintiff's interpretation of the item was reasonable.

The circumstances of the contract's formation bolster plaintiff's interpretation. The Service's first request for bids on the entire 175 acres had clearly designated the quantity of work in each of the three units —106 acres in Snowshoe, 15 in Cathill, and 54 in Gypsy Fork. The purchase order on the second bid contained an identical description of the work (machine site preparation), but reduced the quantity to 45 acres. Plaintiff could reasonably interpret this difference as a reduction in quantity from 175 to 45. Accordingly, plaintiff reduced its bid by more than 75%.

A government contractor, like XXX Construction, "cannot properly be required to exercise clairvoyance in determining its contractual responsibilities." *Corbetta Constr. Co. v. United States*, 198 Ct.Cl. 712, 723, 461 F.2d 1330, 1336 (1972); *see also Blount Bros. Const. Co. v. United States*, 171 Ct.Cl. 478, 496, 346 F.2d 962, 973 (1965); *Salem Eng'g & Const. Corp. v. United States*, 2 Cl.Ct. 803, 807 (1983). The contract ambiguity was not readily apparent. Moreover, a "contractor should not be required to wade through a maze of numbers, catalogues, cross-reference tables and other data resembling cross-word puzzles in order to find out what the government requires in an invitation for bids." *Gorn Corp. v. United States*, 191 Ct.Cl.

---

**6.** The "method of measurement" and "basis for payment" sections of the general specifications do not state which acres are within the project. The "method of measurement" section merely indicates the process for making measurements, not whether the windrows or the entire acreage should be measured. The "basis for payment" section discusses processes for payment. The section promises payment at a rate "equal to satisfactory work." This section, however, does not designate which acres or areas fall within the 45–acre project.

Likewise, the detailed summary sheet, the illustration of proper redistribution of windrow material, and the vicinity maps of each unit do not clarify the 45–acre ambiguity. In fact, the term "45 acres" appears only once in the contract materials—on the purchase order in the quantity column.

560, 566, 424 F.2d 588, 594 (1970). Plaintiff had to rely on the survey flags placed by Forest Service personnel to ascertain the boundaries of the job site. At the close of the project, plaintiff learned that the flagged areas covered far more than 45 acres. At that point, plaintiff discovered the latent ambiguity.

Based on the contract language and the circumstances of contract formation, plaintiff clearly did not know, and could not reasonably have been expected to know, of the ambiguity. In light of the latency of the ambiguity, this court must fix responsibility according to the doctrine of *contra proferentem*. *Government Sys. Advisors Inc. v. United States*, 847 F.2d 811, 813 (Fed.Cir.1988); *Weeks Dredging & Contracting v. United States*, 13 Cl.Ct. 193, 234 (1987), *aff'd* 861 F.2d 728 (Fed.Cir. 1988). The principle of *contra proferentem* requires the court to construe ambiguities against the drafter of the contract. Therefore, defendant, as the drafter of the contract, must bear the responsibility for the ambiguity.

### III. *Accord and Satisfaction*

The court must determine whether the parties reached an accord that was satisfied. The essential elements of accord and satisfaction are "proper subject matter, competent parties, meeting of the minds of the parties, and consideration." *Mil–Spec Contractors, Inc. v. United States*, 835 F.2d 865, 867 (Fed.Cir.1987) (quoting *Brock & Blevins Co. v. United States*, 170 Ct.Cl. 52, 59, 343 F.2d 951, 955 (1965)). In particular, this case requires the court to rule on whether there was a meeting of the plaintiff's and the Government's minds. Without agreement, the parties did not reach an accord. This determination is a question of law. *Merritt–Chapman & Scott Corp. v. United States*, 198 Ct.Cl. 223, 230, 458 F.2d 42, 46 (1972).

■ On December 1, 1980, XXX Construction's representative signed a contract modification. This modification stated that "remeasure of units shows actual acreage to be 49.4 acres"—an increase of 4.4 acres

over the contract acreage. Defendant maintains that plaintiff is "barred from attacking the modification and seeking further damages" by the accord and satisfaction doctrine. Def. Brief filed Sept. 16, 1987, at 5. Because no meeting of the minds occurred, this court rules otherwise. The contract modification was not a model of clarity. By the modification, the parties did not manifest an intent to settle the dispute over 116 acres of work. To the contrary, the modification perpetuated the ambiguity in the contract itself.

Plaintiff understood the modification to entail a remeasurement of the acreage covered by the windrows, not the entire acreage of the work project. Defendant contends that the modification covered all acres worked by plaintiff. In light of these reasonable misunderstandings, no meeting of the minds took place.

The obscure language of the contract modification states: "Remeasure of units shows actual acreage to be 49.4 acres. Contract shows acres to be 45. Increase of 4.4 acres." The document does not identify what land was remeasured. In light of the ambiguity in the underlying contract, the Service could have remeasured either the land actually worked or the land previously covered by the windrows. The November 14, 1980 letter accompanying the modification indicates that the contracting officer believed the remeasurement included "the total acreage involved in scattering the windrows," as opposed to the area occupied by the windrows. The Service's contract daily diary, to the contrary, reveals that the remeasurement covered the acreage occupied by the windrows and not the entire area worked. The contracting officer initially confused what was measured. Even after completion of the contract work, the ambiguity of the original contract persisted in the modification as well as in the mind of the contracting officer.[7] The contract modification is silent about what specifically was remeasured. Although the modification resolves any question about the total acreage covered by the windrows, it did not

7. Only later, on February 27, 1981, in his decision, does the contracting officer assert the position that the Service had paid the plaintiff for the acreage covered by the windrows.

address the larger question of entitlement to compensation for the entire quantity of work performed. Therefore, plaintiff justifiably interpreted the modification as limited to that narrow question.

In any event, accord and satisfaction "means a discharge by the rendering of some performance different from that which was claimed as due and the acceptance of such substituted performance by the claimant as full satisfaction of his claim." *Brock & Blevins Co. v. United States*, 170 Ct.Cl. 52, 58, 343 F.2d 951, 955 (1965). In this instance, plaintiff did not accept the modification as full satisfaction of its claim, but as a remeasurement of a minor part of the contract in issue.

In addition, this court's predecessor clarified that "[t]here must be accompanying expressions sufficient to make the creditor understand, or to make it unreasonable for him not to understand, that the performance is offered to him as full satisfaction of his claim, and not otherwise." *Chesapeake & Potomac Tel. Co. v. United States*, 228 Ct.Cl. 101, 109, 654 F.2d 711, 716 (1981). The obscure language of the modification did not contain expressions making clear that this offer entailed full satisfaction for plaintiff's existing claims. The modification settled that plaintiff was due compensation at $91.00 per acre for another 4.4 acres of windrow work. The modification did not address plaintiff's claim for work performed on an additional 116 acres.

Plaintiff also continued to reserve a claim for work on the entire 165 acres. In the November 14, 1980 letter accompanying the modification, the contracting officer directed plaintiff to "sign and return all three documents to this office." The three documents were the contract modification, the final pay estimate, and the contract release. The November 14, 1980 letter proceeds:

> Payment of the Final Pay Estimate will be processed upon receipt from you of the signed documents. Should you wish to pursue your claim further, you must list it in the 'reservations' section of the Contract Release. If not so listed, your claim will be considered to be withdrawn.

Plaintiff complied carefully with the instructions of the letter. On December 1, 1980, plaintiff signed and returned the contract modification, which it considered limited to windrow acreage. Next, on December 3, plaintiff reserved its claim pertaining to the 116 acres on the signed contract release form. In light of the contracting officer's letter of instruction, plaintiff reasonably concluded that the reservation would be acknowledged prior to payment on the uncontested matter settled by the December 1 letter. The Service would not process any part of the matter for payment before all three documents were received. Of most import, however, plaintiff's reservation on December 3 shows that it had not intended to extinguish its claims on December 1.

This sequence indicates that plaintiff did not reach an accord and satisfaction with defendant on December 1. Plaintiff acted consistently with a timely reservation of its claim. The December 3 reservation would have been unnecessary if plaintiff had reached an accord with defendant on December 1. No meeting of minds occurred on December 1. Although the parties reached an accord on the number of acres covered by the windrows, the parties did not reach an accord on the total number of acres worked by plaintiff. In the absence of a meeting of the minds, that larger claim was not extinguished by an accord and satisfaction.

### IV. *Damages*

■ Defendant does not contest that plaintiff worked on the entire 165 acres. Indeed plaintiff worked, at the direction of defendant, far more than the 45 acres required by plaintiff's reasonable interpretation of the contract's latent ambiguity. Accordingly, plaintiff is entitled to compensation for the additional acres worked at the direction of the Forest Service. Plaintiff received payment at $91.00 per acre for only 49.4 acres of work. Plaintiff now contends that defendant should pay for the remaining 115.6 acres at a rate of $110.00 per acre. This measurement of damages is unreasonable. The Government rejected plaintiff's bid of $110.00 per acre as too

high. The contract set the rate at $91.00 per acre. The contract thus governs the per acre rate for plaintiff's work.

The contract also governs compensable acreage. According to the contract, compensable work is computed by multiplying the "unit bid price" by the "unit area." The unit bid price of the contract was $91.00 per acre. The remaining (uncompensated) unit area is 115.6 acres. Therefore, plaintiff is owed $10,519.60.

## CONCLUSION

The contract drafted by the Government contained a latent ambiguity. Due to the ambiguity, plaintiff performed windrow reclamation and cleaning work on 115.6 acres for which it has received no payment. The parties did not enter into an accord to satisfy the remaining claim. Accordingly, this court grants plaintiff's motion for summary judgment, as modified by this opinion. Defendant's motion for summary judgment is denied. The Clerk of the court shall enter judgment for plaintiff in the amount of $10,519.60, with interest pursuant to 41 U.S.C. § 611 from December 30, 1980. No costs.

IT IS SO ORDERED.