**LAMIRAGE, INC., Gerald Yax, and Vernon Wilson, Plaintiffs,**

v.

**UNITED STATES, Defendant.**

**No. 97–157C.**

United States Court of Federal Claims.

June 17, 1999.

Curtis G. Rundell, II, Troy, Michigan, attorney of record for plaintiffs.

Janene M. Marasciullo, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., with whom were Sharon Y. Eubanks, Deputy Director, Commercial Litigation Branch, David M. Cohen, Director, Commercial Litigation Branch and Frank W. Hunger, Assistant Attorney General, attorneys of record for the defendant. Jeffrey Reim, United States Customs Service, of counsel.

## ORDER

HORN, Judge.

This case comes before the court on the defendant's motion to dismiss pursuant to Rules 12(b)(1) and 12(b)(4) of the Rules of the United States Court of Federal Claims (RCFC). Defendant asserts that this court lacks subject matter jurisdiction as to Count II, the plaintiffs' promissory estoppel count, and that the plaintiffs have failed to state a claim upon which relief can be granted as to Count I, the breach of contract count, because the United States Customs Service (Customs) never agreed either orally or in writing to transfer a Class C Liquor License or a Class D Cabaret Permit to plaintiffs.

In Count I of the Complaint, plaintiffs allege that on April 12, 1994 they entered into an express contract with Customs, in which plaintiffs allege Customs agreed to "the sale of certain real property, and all assets of the business located therein, including but not limited to, the Class C Liquor License with Sunday sales," in exchange for $425,000.00. Although not raised in the plaintiffs' complaint, as the case progressed, the plaintiffs also argued that, in addition to the Class C Liquor License, a Class D Cabaret Permit also should have been transferred to the plaintiffs pursuant to an express contract. Plaintiffs argue, in the alternative, that Customs breached an implied-in-fact contract created between the parties. In Count II, plaintiffs sought recovery based on the theory of promissory estoppel, arguing that the plaintiffs suffered damages as a direct result of the actions of the United States. In their initial complaint, the plaintiffs had included two additional counts alleging due process violations and unjust enrich-

ment, which they subsequently withdrew. The plaintiffs, LaMirage, Inc., a Michigan corporation, Gerald Yax and Vernon Wilson, originally listed as defendants on their complaint, in addition to the United States, the Treasury Department, the United States Customs Service (Customs), and the Michigan Liquor Control Commission. The caption now properly reflects the United States as the sole defendant. For the reasons discussed below, the government's motion to dismiss is **GRANTED**.

### FACTS

In June 1990, the United States District Court, Eastern District of Michigan, Southern Division, issued a Consent Judgment of Forfeiture, Civil Action No. 89–CV–72882–TS, in which certain property was "FORFEITED to the UNITED STATES OF AMERICA to be disposed of by the United States Marshal in accordance with law." The forfeited property was divided into three categories: real property, personal property, and licenses and permits. The property was described in the Consent Judgment of Forfeiture as:

1. *Real Property*. Real property located in the City of Detroit, County of Wayne and State of Michigan; more particularly described as:

LOTS 43 to 55, inclusive, including the adjoining ½ of the vacated alley at the rear thereof, EVERGREEN GARDENS SUBDIVISION, as recorded in Liber 59, of Plats, Page 92, Wayne County Records. (commonly known as 19701–31 West Eight Mile Road, Detroit, MI)

2. *Personal Property*. Equipment, furniture, trade fixtures and all other personal property utilized on or by the premises known as THE SILENT WOMAN. Additionally, any rent received by the United States Marshal during the pendency of this civil in rem action.

3. *Licenses and Permits*. The Michigan Liquor Control Commission Class C License together with Sunday Sales and the entertainment permit being a Cabaret D Permit issued by the City of Detroit for the premises known as THE SILENT WOMAN.

In July 1992, the United States Customs Service placed an advertisement in the *Detroit News* and *Detroit Free Press* newspapers, offering for sale the real property it had obtained as a result of the Consent Judgment of Forfeiture. The advertisement stated:

US CUSTOMS SERVICE

Auction

Pursuant to a stipulation and court order entered on February 28, 1992, in the United States District Court, Eastern District of Michigan, Southern Division, Civil Action No. 91–CV–75827–DT, notice is hereby given that the United States Customs Service will offer for sale the property described as: 19701–197[31] West Eight Mile Road, Detroit, Michigan.

The sale will be offered by closed bid, with a minimum price of five hundred twenty five thousand dollars ($525,000.00). The property will be offered for viewing on the 28th day of July, 1992 between the hours of 12:00 pm and 4:00 pm. Bids will be closed six days following the viewing. Additional information may be obtained by contacting Mr. Jerry Jolin at (313) 954–3550. Bids must be accompanied by cashiers check in a sum equal to ten percent of the bid. Closing will take place within thirty days from acceptance. Sale # 92–38–243. Howell Davis Auctioneer Lic. # 6501253036. Preview Properties, Inc., 6501185563.

The real property offered for sale by Customs in July 1992, and described in the advertisement above, was the same real property forfeited to the United States in the June 1990 Consent Judgment of Forfeiture. The advertisement made no reference to personal property or licenses and permits.

On October 5, 1993, Gerald Yax, Vernon Wilson and their former partner, Gregory Saffady, made a written offer to purchase the property on behalf of a Michigan corporation to be formed. The conditions listed by the offerors were:

A) OWNER TO SATISFY ALL QUALIFIED LIENS FILED AGAINST PROPERTY.

B) BUYER TO ACCEPT PROPERTY "AS IS".

C) PARTIES SHALL EXECUTE A STANDARD PURCHASE AGREEMENT, WHICH WILL INCORPORATE ALL TERMS AND CONDITIONS HEREIN, WITHIN 10 DAYS FROM THE DATE THIS OFFER IS ACCEPTED.

The offer likewise made no reference to personal property or licenses and permits. On December 6, 1993, the parties executed a written, preliminary purchase agreement, which was drafted by plaintiffs (the 1993 Preliminary Purchase Agreement.) Although the 1993 Preliminary Purchase Agreement referred to an inventory list, it had not been compiled at the time the parties discussed the preliminary agreement. The 1993 Preliminary Purchase Agreement stated in relevant part:

2) PURCHASERS agree to pay to the SELLER and SELLER agrees to accept as total purchase price the amount of FOUR HUNDRED TWENTY FIVE THOUSAND DOLLARS ($425,000.00), for the above described property, which includes all fixtures, furniture, components, stock, equipment, inventory and other items as more fully set forth in the listings supplied by the SELLER and attached and referenced hereto as EXHIBIT A;

. . . .

Despite a reference to Exhibit A in the preliminary agreement, no Exhibit A was attached, and, as is evident from later correspondence, Exhibit A had not yet been compiled. Moreover, there is no reference to a Class C Liquor License or a Class D Cabaret Permit in the 1993 Preliminary Purchase Agreement. The 1993 · Preliminary Purchase Agreement was not executed and subsequently was withdrawn.

In the record before the court, the first indication that plaintiffs would take the position that the seller, now the defendant, "has

a Cabaret D Permit [sic] and a Class C License as a result of a previous forfeiture action," appears in a March 24, 1994 letter to the Customs Director from plaintiffs' counsel at the time, Athina T. Siringas.

Thereafter, Vernon Wilson and Gerald Yax drafted and submitted a new purchase agreement, which was executed by the parties on April 12, 1994 (the 1994 Purchase Agreement). Paragraphs 1 and 2 of the 1994 Purchase Agreement expressly state:

1) SELLER agrees to sell, and PURCHASERS agree to purchase the following real estate located in the City of Detroit, County of Wayne, State of Michigan:

Lots 43 through 55, inclusive, including ½ of the vacated alley as the rear thereof, EVERGREEN GARDENS SUBDIVISION, as recorded in Liber 59, Page 92 of Plats, Wayne County Records.

2) PURCHASER agrees to pay the SELLER and SELLER agrees to accept the [sic] as total purchase price the amount of FOUR HUNDRED TWENTY FIVE THOUSAND DOLLARS ($425,000.00), for the above described property, which includes all fixtures, furniture, components, stock, equipment, inventory and other items as more fully set forth in the history supplied by the SELLER and attached and referenced hereto as EXHIBIT A;

. . . .

Exhibit A to the 1994 Purchase Agreement, which was signed by the plaintiffs, titled "Fatal Attraction Inventory List," only listed personal property. This inventory list did not reference or include either a Class C Liquor License or a Class D Cabaret Permit as part of the inventory to be transferred with the purchase.[1]

After the execution of the 1994 Purchase Agreement, on May 12, 1994, plaintiffs' former attorney, Athina Siringas, wrote to Customs indicating that:

---

1. The parties have stipulated that "the Exhibit A included in the April 12, 1994 Purchase Agreement attached to the complaint is not the Exhibit A that was included in the original April 12, 1994 Purchase Agreement." Thus, plaintiffs have admitted that they attached an incorrect version of Exhibit A to the copy of the 1994 Purchase

Agreement submitted as part of their original filing with this court, and that the version of Exhibit A which actually accompanied the 1994 Purchase Agreement when it was signed by both parties did not reference the Class C Liquor License or the Class D Cabaret Permit.

The attached Exhibit A is incomplete as we are requesting that licenses and permits also be included in Exhibit A. I have modified Exhibit A to reflect that the class C license and cabaret D permit [sic] are also being sold to purchasers.

Enclosed with the letter sent by Ms. Siringas was a proposed revision to Exhibit A, that added the Class D Cabaret Permit and Class C Liquor License with Sunday Sales and Entertainment Permit, to the inventory of personal property previously listed to be conveyed by the seller to the purchaser.

Upon receiving the May 12, 1994 letter, Customs wrote to plaintiff's former attorney:

Your letter of May 12th contends that Exhibit "A" is incomplete, that a license and permit should also be included, and that you have modified Exhibit A to reflect that the Class C license and Cabaret D permit are also being sold to the purchaser.

In view of the fact that the Customs Service does not have physical possession of the Class C license and Cabaret D permit [sic], we are not in a position to agree to the addition of the two items to the FATAL ATTRACTION INVENTORY LIST attached as Exhibit A to the Purchase Agreement. However, the Customs Service is willing to and hereby relinquishes, transfers, conveys and releases any and all right, title and interest it may have in and to such license or permit which was forfeited to the United States by order of said court.

Subsequently, the plaintiffs filed suit in this court and alleged in their complaint that a Class C Liquor License should have been transferred from Customs to the plaintiffs.

### DISCUSSION

The government filed a motion to dismiss the complaint for lack of jurisdiction and for failure to state a claim upon which relief can be granted pursuant to RCFC 12(b)(1) and 12(b)(4). In addition to arguing that Customs did not breach the 1994 Purchase Agreement, the government contends that this court lacks jurisdiction under the Tucker Act over plaintiffs' claims stemming from implied-in-law contracts and on causes of action based on promissory estoppel. When considering a motion to dismiss, the court may consider all relevant evidence in order to resolve any disputes as to the truth of the jurisdictional facts alleged in the complaint. *Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d 746, 747 (Fed.Cir.1988). The court is required to decide any disputed facts which are relevant to the issue of jurisdiction. *Id.*

The standard for weighing the evidence presented by the parties when evaluating a motion to dismiss has been articulated by the United States Supreme Court, as follows: "in passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *accord Hamlet v. United States,* 873 F.2d 1414, 1416 (Fed.Cir.1989); *see also Alaska v. United States,* 32 Fed.Cl. 689, 695 (1995), *appeal dismissed,* 86 F.3d 1178 (Fed.Cir.1996). In rendering a decision, the court must presume that the undisputed factual allegations included in the complaint by a plaintiff are true. *Miree v. DeKalb County,* 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977); *Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d at 746; *Alaska v. United States,* 32 Fed.Cl. at 695.

The burden of establishing jurisdiction is on the plaintiffs. *McNutt v. General Motors Acceptance Corp. of Indiana,* 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936); *Alaska v. United States,* 32 Fed.Cl. at 695; *Catellus Dev. Corp. v. United States,* 31 Fed.Cl. 399, 404 (1994). The court should not grant a motion to dismiss "unless it appears beyond doubt that the plaintiffs can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (footnote omitted). Nonetheless, "conclusory allegations unsupported by any factual assertions will not withstand a motion to dismiss." *Briscoe v. LaHue,* 663 F.2d 713, 723 (7th Cir.1981), *aff'd,* 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983).

In order for this court to have jurisdiction over plaintiffs' complaint, the Tucker Act, as amended, 28 U.S.C. § 1491 (1994 & Supp. II 1998), requires that a substantive right, which is enforceable against the United States for money damages, must exist independent of 28 U.S.C. § 1491. The Tucker Act provides:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1). The Tucker Act merely confers jurisdiction on the United States Court of Federal Claims; it does not create a substantive right that is enforceable against the United States for money damages. *United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d 607, *reh'g denied,* 446 U.S. 992, 100 S.Ct. 2979, 64 L.Ed.2d 849 (1980); *United States v. Testan,* 424 U.S. 392, 398–99, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976); *United States v. Connolly,* 716 F.2d 882, 885 (Fed.Cir.1983) (en banc), *cert. denied,* 465 U.S. 1065, 104 S.Ct. 1414, 79 L.Ed.2d 740 (1984).

Moreover, a waiver of the traditional sovereign immunity "cannot be implied but must be unequivocally expressed." *United States v. King,* 395 U.S. 1, 4, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969) (citing *United States v. Sherwood,* 312 U.S. 584, 61 S.Ct. 767, 85 L.Ed. 1058 (1941)). The individual claimants, therefore, must look beyond the jurisdictional statute for a waiver of sovereign immunity. *United States v. Testan,* 424 U.S. at 398, 96 S.Ct. 948. "[I]n order for a claim against the United States founded on statute or regulation to be successful, the provisions relied upon must contain language which could fairly be interpreted as mandating recovery of compensation from the government." *Cummings v. United States,* 17 Cl.Ct. 475, 479 (1989), *aff'd,* 904 F.2d 45 (Fed.Cir.1990) (citations omitted); *see also United States v. Mitchell,* 463 U.S. 206, 216–17, 103 S.Ct.

2961, 77 L.Ed.2d 580 (1983) (citing *United States v. Testan,* 424 U.S. at 400, 96 S.Ct. 948 (quoting *Eastport Steamship Corp. v. United States,* 178 Ct.Cl. 599, 607, 372 F.2d 1002, 1009 (1967))); *Duncan v. United States,* 229 Ct.Cl. 120, 138, 667 F.2d 36, 47 (1981), *cert. denied,* 463 U.S. 1228, 103 S.Ct. 3569, 77 L.Ed.2d 1410 (1983).

In the above captioned case, plaintiffs assert that they entered into an "express contract" with Customs, pursuant to which the government allegedly agreed to "the sale of certain real property, and all assets of the business located therein including, but not limited to the Class C Liquor License with Sunday sales, in exchange for $425,000.00." Thereafter, plaintiffs allege that Customs breached the 1994 Purchase Agreement by violating its express terms.

■ Although the court possesses subject matter jurisdiction over plaintiffs' breach of contract claim, as discussed below, the allegations fail to state a claim upon which relief can be granted. It is well settled that to recover for a breach of contract with the United States, whether express or implied-in-fact, a plaintiff must allege facts sufficient to establish the existence of a contract. *Trauma Serv. Group v. United States,* 104 F.3d 1321, 1325 (Fed.Cir.1997). In order to establish a valid contract the plaintiffs must demonstrate "a mutual intent to contract including offer, acceptance, and consideration; and authority on the part of the government representative who entered or ratified the agreement to bind the United States in contract." *Total Medical Management, Inc. v. United States,* 104 F.3d 1314, 1319 (Fed.Cir. 1997); *see also Lewis v. United States,* 70 F.3d 597, 600 (Fed.Cir.1995). In order to demonstrate that there was a meeting of the minds and mutual agreement regarding specific contract terms, there must have been an unambiguous offer to contract upon specific terms, an unambiguous acceptance of that offer, and an intent to contract. Mere negotiations do not demonstrate a meeting of the minds. *See Pacific Gas & Electric Co. v. United States,* 3 Cl.Ct. 329, 339 (1983), *aff'd,* 738 F.2d 452 (Fed.Cir.1984). "Whether a legally enforceable contract has been formed by a meeting of the minds depends upon the

totality of the factual circumstances." *Texas Instruments v. United States,* 922 F.2d 810, 815 (Fed.Cir.1990).

■ The party seeking to enforce the contract must provide "objective proof of a meeting of the minds. The prospective contracting parties are not expected to engage in telepathy." *Firth Construction Co., Inc. v. United States,* 36 Fed.Cl. 268, 276 (1996). Furthermore, it is well settled that a party may not rely upon its subjective understanding of an agreement to overcome the plain and unambiguous terms of a written agreement. *Nicholson v. United States,* 29 Fed. Cl. 180, 196 (1993); *Tri–O, Inc. v. United States,* 28 Fed.Cl. 463, 471 (1993). The determination of whether the parties in a lawsuit had a meeting of the minds is a question of law for the court to determine. *Merritt–Chapman & Scott Corp. v. United States,* 198 Ct.Cl. 223, 458 F.2d 42, 46 (1972); *XXX Constr. Co. v. United States,* 16 Cl.Ct. 491, 498 (1989).

In the instant action, the record demonstrates that on October 5, 1993, plaintiffs made a written offer to purchase the property. The offer did not require Customs to convey a Class C Liquor License, or a Class D Cabaret Permit, nor was it conditioned upon defendant's ability to obtain any licenses or permits. In fact, plaintiffs offered to buy the property "as is." Although the December 3, 1993 Preliminary Purchase Agreement, executed by the parties and drafted by the plaintiffs, referred to an Exhibit A, a purported inventory list, the list had not been compiled, and, therefore, could not have been attached at the time the plaintiff submitted the 1993 Preliminary Purchase Agreement. The parties executed the actual and final 1994 Purchase Agreement on April 12, 1994. The record before the court also clearly establishes that the Exhibit A inventory list included in the executed 1994 Purchase Agreement did not include a liquor license or a cabaret permit.

On May 12, 1994, subsequent to the execution of the 1994 Purchase Agreement, plaintiffs' former counsel, Athina Siringas, wrote to Customs and requested that the inventory list be modified to include the Class C Liquor License and the Class D Cabaret Permit.

This subsequent correspondence from plaintiffs' former counsel further demonstrates that the 1994 Purchase Agreement, executed by Customs and plaintiffs, did not include the Class C Liquor License or the Class D Cabaret Permit on the Exhibit A inventory list that was attached to the 1994 Purchase Agreement.

Furthermore, the record, including plaintiffs' own admissions, indicates that Customs specifically refused plaintiffs' requests to modify the inventory list attached to the 1994 Purchase Agreement to include the Class C Liquor License and the Class D Cabaret Permit. The government responded to Ms. Siringas' May 12, 1994 letter, which requested addition of the Class C Liquor License and the Class D Cabaret Permit to the list, and advised plaintiffs that because "the Customs Service does not have physical possession of the Class C license and Cabaret D permit, we are not in a position to agree to the addition of the two items to the FATAL ATTRACTION INVENTORY LIST attached as Exhibit A to the Purchase Agreement." The fact that Customs did not agree to transfer a liquor license or a cabaret permit when signing the 1994 Purchase Agreement also is evident in a facsimile sent to Customs by plaintiffs' attorney in July 1995 requesting "Customs to modify its decision relating to transfer of its interest in property known as and referred to as FATAL ATTRACTION." In a letter dated July 31, 1995, Customs reiterated that it could not agree to the addition of the liquor license and cabaret permit to the inventory list because it did not have possession of either item. The parties have stipulated and the evidence in the record demonstrates that the plaintiffs executed the 1994 Purchase Agreement despite the fact that the inventory list did not include the Class C Liquor License or Class D Cabaret Permit. At the time of closing, the inventory list incorporated into the 1994 Purchase Agreement did not include a Class C Liquor License or Class D Cabaret Permit.

■ Plaintiffs' decision to execute and sign the April 12, 1994 Purchase Agreement, with the Class C Liquor License and Class D Cabaret Permit absent from the inventory

list, precludes them from now contesting the contents of the inventory list included in that 1994 Purchase Agreement. "It is well settled that [a] person's signature on a written instrument normally indicates assent to the terms of that document." *Alaska Am. Lumber Co., Inc. v. United States*, 25 Cl.Ct. 518, 529 (1992) (quoting *Carpenter v. United States*, 4 Cl.Ct. 705, 714 (1984)). Consequently, "a person may not agree to a contractual obligation and later seek avoidance thereof through assertions of ignorance over the contract terms." *Nicholson v. United States*, 29 Fed.Cl. at 189. It is also settled that, "[a] contractor must stand by the words of his contract." *Upton v. Tribilcock*, 91 U.S. 45, 50, 23 L.Ed. 203 (1875).

■ Moreover, a possible ambiguity in a contract is generally construed against the drafter. *See Metric Constructors, Inc. v. National Aeronautics and Space Admin.*, 169 F.3d 747, 751 (Fed.Cir.1999); *Hills Materials Co. v. Rice*, 982 F.2d 514, 516 (Fed. Cir.1992). The plaintiffs in the instant action drafted the offer, the terms of both purchase agreements, and the Exhibit A inventory list, and, therefore, cannot now contest the terms of the executed agreement, or claim that it was their understanding that a liquor license and cabaret permit would be conveyed with the property. Such an unexpressed, subjective, unilateral expectation is plainly insufficient to overcome the express terms of the 1994 Purchase Agreement. *See Nicholson v. United States*, 29 Fed.Cl. at 196.

■ Thus, the record reflects that on several occasions, Customs rejected plaintiffs' requests regarding the Class C Liquor License and the Class D Cabaret Permit. Customs expressly advised plaintiffs that it did not have the liquor license or the cabaret permit and could not agree to include either as part of the inventory being transferred with the property. Accordingly, as to Count I, the court finds that there was no meeting of the minds regarding a contractual obligation to transfer a Class C Liquor License or a Class D Cabaret Permit to the plaintiffs.

Count II of plaintiffs' complaint is titled "Promissory Estoppel." In the briefs filed with the court, however, the plaintiffs adjusted their legal argument and stated, "At first glance, [Count II of] plaintiff's [sic] case may appear to be based on promissory estoppel, however, it is in fact a claim alleging equitable estoppel." Plaintiffs allege that Customs made numerous representations to plaintiffs upon which they relied in purchasing the property. Specifically, plaintiffs allege Customs represented that there was a valid Class C Liquor License and Class D Cabaret Permit for the premises and that Customs would transfer the licenses and permits along with the property. Plaintiffs allege that Customs made these representations to induce plaintiffs to purchase the property and that plaintiffs relied upon these promises in deciding to purchase the property. The confusion caused by plaintiffs' pleadings requires an examination of both doctrines asserted, promissory and equitable estoppel. Plaintiffs, however, fail on both theories.

The difference between promissory and equitable estoppel has been explained as follows:

> Plaintiffs contend that their claim is based upon equitable estoppel. Defendant, on the other hand, contends that the theory upon which plaintiffs rely is promissory estoppel. As this court explained in *Durant* [*v. United States* ], 16 Cl.Ct. [447,] 449–50 [ (1988) ], this distinction is crucial, because the Claims Court does not have jurisdiction under the Tucker Act, 28 U.S.C. § 1491, to consider promissory estoppel claims. "Promissory estoppel is a doctrine for enforcing promises which reasonably induce action or inaction and which are binding to the extent necessary to avoid injustice." *Id.* at 450. As stated by the United States Court of Appeals for the Ninth Circuit in *Jablon v. United States*, 657 F.2d 1064, 1068 (9th Cir.1981), "promissory estoppel is used to create a cause of action, whereas equitable estoppel is used to bar a party from raising a defense or objection it otherwise would have, or from instituting an action which it is entitled to institute." *Id.* "Promissory estoppel is a sword, and equitable estoppel is a shield." *Id.*

*Knaub v. United States*, 22 Cl.Ct. 268, 276 (1991).

■ Promissory estoppel has been defined as "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." John Cibinic, Jr. & Ralph C. Nash, Jr., *Formation of Government Contracts,* Ch. 2, § II.C, at 258 (3d ed.1998) (quoting *Restatement, Second, Contracts* § 90).

■ It is well settled that this court is without jurisdiction to entertain claims arising from a contract, based on the theory of promissory estoppel, or based on contracts implied-in-law. *Hercules v. United States,* 516 U.S. 417, 423, 116 S.Ct. 981, 134 L.Ed.2d 47 (1996); *United States v. Mitchell,* 463 U.S. 206, 218, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983); *Gregory v. United States,* 37 Fed.Cl. 388, 396 (1997); *Knaub v. United States,* 22 Cl.Ct. at 276; *Pacific Gas & Elec. Co. v. United States,* 3 Cl.Ct. at 340. Therefore, plaintiffs cannot recover under Count II of their complaint on a theory of promissory estoppel in this court and it must be dismissed for lack of jurisdiction.

■ Alternatively, as stated above, plaintiffs have tried to recast Count II as one based on an equitable estoppel theory. The doctrine of equitable estoppel is a judicial remedy by which a party may be precluded, by its own acts or omissions, from asserting a right to which it otherwise would have been entitled. *See Heckler v. Community Health Servs. of Crawford County, Inc.,* 467 U.S. 51, 59, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984). Although the United States Supreme Court in *Heckler* did not come to a final conclusion as to whether equitable estoppel could be raised against the United States, the Supreme Court appears to suggest that there are limited circumstances in which equitable estoppel is applicable against the sovereign. *Id.* at 60, 104 S.Ct. 2218. The Supreme Court stated in *Heckler:*

When the Government is unable to enforce the law because the conduct of its agents has given rise to an estoppel, the interest of the citizenry as a whole in obedience to the rule of law is undermined. It is for this reason that it is well settled that the Government may not be estopped on the same terms as any other litigant. Petitioner urges us to expand this principle into a flat rule that estoppel may not in any circumstances run against the Government. We have left the issue open in the past, and do so again today. Though the arguments the Government advances for the rule are substantial, we are hesitant, when it is unnecessary to decide this case, to say that there are *no cases* in which the public interest in ensuring that the Government can enforce the law free from estoppel might be outweighed by the countervailing interest of citizens in some minimum standard of decency, honor, and reliability in their dealings with their Government. But however heavy the burden might be when an estoppel is asserted against the Government, the private party surely cannot prevail without at least demonstrating that the traditional elements of an estoppel are present.

*Heckler v. Community Health Servs. of Crawford County, Inc.,* 467 U.S. at 60–61, 104 S.Ct. 2218 (footnotes omitted) (emphasis in original). When a plaintiff claims equitable estoppel against the government, in order to warrant judicial intervention and prevail, the party invoking the doctrine against the United States bears a heavy burden to prove the elements of estoppel. *See id.* at 61, 104 S.Ct. 2218.

■ In *JANA, Inc. v. United States,* 936 F.2d 1265 (Fed.Cir.1991), *cert. denied,* 502 U.S. 1030, 112 S.Ct. 869, 116 L.Ed.2d 775 (1992), the United States Court of Appeals for the Federal Circuit addressed the issue of equitable estoppel in a government contract case:

It is also not entirely clear whether the defense of estoppel is still available against the government in light of the Supreme Court's decision in *OPM v. Richmond,* [496 U.S. 414,] 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990), which held that, absent fraud by the government, estoppel could never be asserted against it in suits to compel the payment of money from the public treasury in contravention of eligibility re-

quirements contained in an Act of Congress. Public monies are unquestionably involved here, although statutory eligibility requirements are not.

In any event, even if our contract precedent prior to *Richmond* is still valid, it is clear that the requirements of estoppel were not shown here. That pre-*Richmond* precedent had held that when estoppel is asserted against the government in the context of a contract dispute, the necessary elements are: (1) the government must know the true facts; (2) the government must intend that its conduct be acted on or must so act that the contractor asserting the estoppel has a right to believe it so intended; (3) the contractor must be ignorant of the true facts; and (4) the contractor must rely on the government's conduct to his injury. *American Electronic Laboratories, Inc. v. United States*, 774 F.2d 1110, 1113 (Fed.Cir.1985); *Emeco Industries, Inc. v. United States*, 485 F.2d 652, 657, 202 Ct.Cl. 1006 (1973).

*Id.* at 1270. In *Burnside–Ott Aviation Training Center, Inc. v. United States*, 985 F.2d 1574 (Fed.Cir.1993), the United States Court of Appeals for the Federal Circuit held that the Supreme Court's holding in *OPM v. Richmond*, 496 U.S. 414, 110 S.Ct. 2465, 110 L.Ed.2d 387, must be limited to claims of entitlement contrary to statutory appropriations, and indicated that there was still life in the equitable estoppel doctrine:

The Claims Court improperly relied on *Richmond* to conclude that Burnside–Ott's equitable estoppel claim is barred as a matter of law. In particular, the Claims Court erred in concluding that *Richmond* stands for the proposition that equitable estoppel will not lie against the government for any monetary claim. The *Richmond* holding is not so broad. *Richmond* is limited to "claim(s) for the payment of money from the Public Treasury *contrary to a statutory appropriation.*" 496 U.S. at 424, 110 S.Ct. at 2471 (emphasis added). Indeed, because the Supreme Court's analysis in *Richmond* is based entirely on the Appropriations Clause of the Constitution, Article 1, Section 9, Clause 7, which provides that "No money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law," its holding must be limited to claims of entitlement contrary to statutory appropriations.

Burnside–Ott's assertion of a right to payment of money from the Public Treasury, however, is not based upon a statutory entitlement. Burnside–Ott's assertion is instead based upon its contract with the Navy. Nor does Burnside–Ott claim entitlement contrary to statutory eligibility criteria, as did *Richmond*. Thus, neither the holding nor analysis in *Richmond* is applicable in this case, and Burnside–Ott's equitable estoppel claim is not barred as a matter of law because of *Richmond*. Equitable estoppel may or may not apply in this case depending on facts yet to be established.

*Burnside–Ott Aviation Training Center, Inc. v. United States*, 985 F.2d at 1581 (alteration in original).

█ In the instant case, plaintiffs' attempt to invoke the doctrine of equitable estoppel to obligate the government to provide a Class C Liquor License and a Class D Cabaret Permit fails because the plaintiffs cannot satisfy the second prong of the equitable estoppel test ("the government must intend that its conduct be acted on or must so act that the contractor asserting the estoppel has a right to believe it so intended"). *JANA, Inc. v. United States*, 936 F.2d at 1270.[2] The record clearly establishes that the 1994 Purchase Agreement, drafted and

2. The record presented to the court also contains the Declaration of Harvey Pack, a Customs employee who handled the sale of the Fatal Attraction property. This Declaration was not used by the court to decide the Motion to Dismiss. However, the court notes that, according to the Declaration of Mr. Pack, plaintiffs advised Mr. Pack that they had initiated the process to obtain their own Class C Liquor License and a Class D Cabaret Permit before the closing on the property.

This suggests that plaintiffs appear to have known that Customs did not intend to convey and/or did not have a Class C Liquor License or a Class D Cabaret Permit. Thus, the plaintiffs would not satisfy the third prong of the equitable estoppel test ("the contractor must be ignorant of the facts"), because the plaintiffs do not appear to have been ignorant of the fact that the government did not have the licenses and permits the plaintiffs desired.

signed by the plaintiffs, was clear on its face, and that the attached inventory list of property to be transferred failed to include or reference a Class C Liquor License or a Class D Cabaret Permit.

It also is apparent, from the newspaper advertisement, the 1993 Preliminary Purchase Agreement, the 1994 executed Purchase Agreement and the subsequent, written communications, that Customs never intended to transfer the Class C Liquor License and Class D Cabaret Permit. Customs officials stated that they did not possess a Class C Liquor License or a Class D Cabaret Permit and clearly communicated this position to the plaintiffs. Customs' position that it only intended to convey the "real property," namely, 19701–19731 West Eight Mile Road, is evident in an advertisement in the *Detroit News* and *Detroit Free Press,* which read as follows:

> Pursuant to a stipulation and court order entered on February 28, 1992, in the United States District Court, Eastern District of Michigan, Southern Division, Civil Action No. 91–CV–75827–DT, notice is hereby given that the United States Customs Service will offer for sale the property described as: 19701–197[31] West Eight Mile Road, Detroit, Michigan.

Although, Customs did transfer some personal property listed on the inventory list that accompanied the executed 1994 Purchase Agreement, the Class C Liquor License and the Class D Cabaret Permit were not listed or included. Plaintiffs' equitable estoppel argument is without merit, and is not a defense to the motion to dismiss.[3]

**3.** The strong evidence submitted to the court, including those documents previously referenced and used by the court to decide the motion to dismiss, and the Declaration of Mr. Pack, which was not used by the court to decide defendant's motion to dismiss, firmly suggests that Customs did not offer or believe it possessed either a Class C Liquor License or a Class D Cabaret Permit. For example, Mr. Pack's Declaration states that Customs petitioned the United States Court for the Eastern District of Michigan to allow Customs to sell the property at the reduced amount offered by plaintiffs in the instant lawsuit specifically because Customs did not possess, and could not convey, either the Class C Liquor License or the Class D Cabaret Permit.

### *CONCLUSION*

After thoroughly reviewing the record and hearing oral argument, the court holds that the express contract, signed by the parties on April 12, 1994, is clear on its face. The inventory list, incorporated and referenced as Exhibit A to that contract, did not include a Class C Liquor License or a Class D Cabaret Permit at the time the contract was executed. Plaintiffs, therefore, have failed to state a claim upon which relief can be granted. Furthermore, this court is without jurisdiction to entertain the plaintiffs' promissory estoppel claim. Even recharacterized as an equitable estoppel defense to defendant's motion to dismiss, however, the plaintiffs cannot prevail. The court, hereby, **GRANTS** the defendant's motion to dismiss all claims included in the plaintiffs' complaint pursuant to RCFC 12(b)(1) and 12(b)(4).

**IT IS SO ORDERED.**

In sum, plaintiffs made a written offer to purchase the property from Customs that resulted in the 1994 Purchase Agreement. Neither the offer nor the 1994 Purchase Agreement included a requirement for Customs to convey a Class C Liquor License or a Class D Cabaret Permit, and neither the offer nor the 1994 Purchase Agreement were conditioned upon the plaintiffs' successfully obtaining the license and permit. Thus, even if defendant's motion to dismiss had been denied, the available evidence strongly suggests that plaintiffs also would be unable to prevail on either a motion for summary judgment pursuant to RCFC 56 or at trial.